John C. MALLIOS d/b/a Mallios & Associates, Mallios & Associates, P.C., and James D. Blume, Petitioners,

v.

Mark W. BAKER, Respondent.

No. 98–0408.

Supreme Court of Texas.

Argued Dec. 8, 1998.

Decided Jan. 6, 2000.

Jennifer S. Stoddard, Dallas, for Petitioner.

Darrell D. Minter, Dallas, for Respondent.

Justice GONZALES delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice HANKINSON, and Justice O'NEILL joined.

In this case we must decide whether the trial court properly issued summary judgment for the defendants, an attorney and a law firm, on the theory that the plaintiff, contrary to Texas public policy, had assigned a portion of his legal malpractice claim to a third party and therefore should be barred from pursuing the claim. The court of appeals reversed the summary judgment and remanded. 971 S.W.2d 581. While we do not reach the question of whether the agreement between the plaintiff and the third party violated public policy, we agree that summary judgment for the defendants is improper on this record. Consequently, we affirm the court of appeals' judgment.

Mark Baker was seriously injured on his motorcycle when he fled from police officers attempting to stop him for driving while intoxicated on the wrong side of the road. Baker sued the owner of Mimi's Pub for selling him alcoholic beverages when he allegedly was so obviously intoxicated that he was a clear danger to himself and others. He hired attorneys John Mallios and James Blume, and their firm, Mallios and Associates, P.C. (collectively, "Mallios") to represent him. On Baker's behalf, Mallios sued Shades Automotive Glass Tinters, Inc., whom Mallios believed to be the owner of Mimi's Pub, and obtained a default judgment for more than $1 million. Baker then sought out T.J. Herron after reading a local newspaper advertisement by Herron that he would buy judgments in excess of $25,000. After some investigation, Herron concluded that Shades Automotive did not own Mimi's Pub, and that Mallios had sued the wrong person. Because Baker's personal injury claim against the real owner was by then barred by limitations, Baker decided to sue Mallios for legal malpractice.

Baker and Herron signed an agreement in which Baker assigned an interest in the proceeds from his malpractice claim against Mallios to Herron in exchange for Herron's assistance in pursuing the claim. The agreement provided that Herron would recommend legal counsel and negotiate the terms of employment for Baker subject to his approval, and would pay "all attorney fees, costs and expenses of the investigation, pursuit and prosecution" of those claims. Herron would be reimbursed out of any recovery from Mallios and would also be entitled to fifty percent of any recovery net of all expenses. The parties also agreed that Baker's claims could not be settled without both Baker's and Herron's consent and Baker would "fully cooperate in the investigation, pursuit and prosecution" of the claims against Mallios. The agreement also allowed Herron to terminate it if he determined that prosecuting Baker's claims "would prove not to be economically feasible."

Herron recommended to Baker that he engage attorney Darrell Minter to pursue his malpractice claim. Consistent with Herron's recommendation, Baker hired Minter to represent him on an hourly rate basis. At the same time, Baker, Minter, and Herron all signed an agreement providing that Herron would pay Minter's hourly fees, plus an additional contingent fee of ten percent of Herron's net recovery. Herron also guaranteed payment of all sums due to Minter and agreed to be solely responsible for such payment.

Minter then filed this lawsuit for Baker against Mallios. Mallios moved for summary judgment on the theory that Baker had assigned part of his claim to Herron and therefore Baker's prosecution of the claim contravened public policy. The trial court apparently agreed and granted summary judgment for Mallios. Concluding that the arrangement between Baker and Herron did not violate any public policy rationale expressed by Texas and other courts for precluding some assignments of

legal malpractice claims, the court of appeals reversed. 971 S.W.2d 581.

The relief Mallios sought below dictates how we must consider this appeal. Mallios moved for and obtained summary judgment against Baker. Mallios's summary judgment motion could only have been based on one of two theories: either that Baker assigned his claim to Herron and therefore Baker is not the proper party to pursue it, or that Baker, by making an invalid assignment, is precluded from bringing the claim.

Mallios propounded only the second theory—that Baker's legal malpractice claim is barred because he purportedly assigned it to Herron and that such an assignment contravenes public policy. But even assuming Mallios is correct that the agreement between Baker and Herron violates Texas public policy, an issue we do not decide today, the question remains whether that invalidity would entitle Mallios to a take-nothing judgment on Baker's malpractice claim. The situation here is not like the one in *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex.1996), for example, in which we rendered a take-nothing judgment against the purported assignee of a claim because the assignment was void, leaving her no claim to pursue. *Id.* at 697; *see also Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd). Here, Baker is the alleged assignor, and assuming there was a partial assignment, Baker still retained a portion of his claim. Mallios does not dispute that Baker had the right to sue Mallios before Baker's agreement with Herron. And even if we were to reach the issue of the agreement's validity and determine that Mallios is correct that it is an invalid assignment, that would not vitiate Baker's right to sue Mallios. Thus, either way, summary judgment was improper and Baker may continue his suit. We therefore express no opinion on the validity of the underlying arrangement between Baker and Herron.

1. 971 S.W.2d 581.

Accordingly, we conclude that the trial court should not have granted summary judgment against Baker, and we affirm the court of appeals' judgment.

Justice HECHT filed a concurring opinion, in which Justice OWEN, Justice BAKER, and Justice ABBOTT joined.

Justice ENOCH filed a concurring opinion, in which Chief Justice PHILLIPS joined.

Justice HECHT, joined by Justice OWEN, Justice BAKER, and Justice ABBOTT, concurring.

The principal question in this case is whether a person may buy all or part of a legal malpractice claim purely as an investment, unrelated to any other transaction. That is the issue that the defendant raised and the parties argued in the district court, and the issue that the district court decided. It is the issue that the parties briefed in the court of appeals, and the issue that the court of appeals decided.[1] It is the issue that the parties briefed and argued in this Court. The answer is that if the interest purchased gives such a buyer not merely a share in any recovery but substantial control over the claim, the transfer contravenes public policy and is therefore void.

The Court dodges the only question the parties and the lower courts have put to us because, it says, the assignor of an interest in a legal malpractice claim may prosecute the claim even if the assignment is void. No doubt he can, but that does not spare the Court from answering the question. If the assignor *would not* prosecute his claim, absent an assignee's investment in it, then the validity of the assignment is, as a very real and practical matter, crucial to the case. The assignor *could* prosecute his claim, but he *won't*. And if the assignee *would not* continue to bankroll the prosecution of the claim if he knew that he could not share in the recovery, that too would

affect the case. Holding the assignment invalid does not require judgment against the assignor, I agree, but it will certainly affect the assignor's willingness to continue on and the assignee's willingness to finance the effort. The assignor, the assignee, and the defendant are all three directly affected by whether the assignment is valid, and they are entitled to an answer—which is that the assignment is invalid.

The parties in this case are in the same situation as the parties in *Elbaor v. Smith*.[2] There a plaintiff and defendant settled with a so-called Mary Carter agreement: that is, the defendant took an assignment of a financial interest in any recovery by the plaintiff, and remained a party in the case. At trial, the settling defendant supported the plaintiff's position as against a nonsettling defendant. We held that such agreements contravene public policy because they provide ulterior financial incentives for parties to take positions they would not otherwise take and thus unfairly distort litigation.[3] There is nothing wrong with one defendant siding with the plaintiff against another defendant; the one defendant may believe the other to be liable. The vice is not in the unusual alignment of the parties, but in the financial incentives that encourage the alignment. So in the present case: the vice is not in a mere assignment of part of plaintiff's recovery, but in an assignment coupled with such control that the third party assignee has a commercial investment in the outcome and the power to protect it. Whether the assignment in this case is valid has very real and practical significance to all the parties. I would conclude that the assignment in this case is invalid, for the reasons I now explain.

# I

Severely intoxicated, Mark W. Baker was driving his motorcycle home from Mimi's Pub about 2:00 a.m. when police officers attempted to stop him, apparently for driving on the wrong side of the road. Trying to outrun them, Baker lost control, wrecked his motorcycle, and sustained serious injuries. He was charged with multiple offenses, pleaded *nolo contendere* to one—evading arrest—and received deferred adjudication.

Baker decided to sue the owner of Mimi's Pub for selling him alcoholic beverages when he was so obviously intoxicated as to be a clear danger to himself and others, a cause of action permitted by section 2.02(b) of the Texas Alcoholic Beverage Code.[4] He retained attorneys John C. Mallios and James D. Blume, and their firm, Mallios and Associates, P.C. (collectively, "Mallios") to represent him. On Baker's behalf, Mallios sued Shades Automotive Glass Tinters, Inc., whom Mallios thought was the owner of Mimi's Pub, and obtained a default judgment for more than $1 million.

Mallios believed the judgment to be uncollectible, but Baker was not convinced, so when he saw T.G. Herron's advertisement in a local newspaper offering to buy judgments in excess of $25,000, Baker sought Herron's help. After some investigation, Herron concluded that Shades Automotive did not own Mimi's Pub, and thus, Mallios had sued the wrong entity. Because Baker's personal injury claim against the real owner was by then barred by limitations, he decided to sue Mallios for legal malpractice.

Baker and Herron signed an agreement reciting that Baker wanted to sue Mallios but lacked "the necessary resources" and needed Herron's assistance "in the form of coordination of various matters", all of which Herron desired to supply. The agreement stated that:

- Herron would recommend legal counsel for Baker and negotiate terms of

---

**2.** 845 S.W.2d 240 (Tex.1992)

**3.** *Id.* at 247–49.

**4.** *Smith v. Sewell,* 858 S.W.2d 350, 352–54 (Tex.1993).

employment subject to Baker's approval, would "provide support services in the form of the coordination of matters pertaining to" Baker's claims against Mallios, and would pay "all attorney's fees, costs and expenses of the investigation, pursuit and prosecution" of those claims;

- Herron would be reimbursed out of any recovery from Mallios and would also be entitled to fifty percent of any recovery net of all expenses, but if there were no recovery, Baker would have no obligation to repay Herron any fees or expenses spent for prosecution of the lawsuit;

- Baker's claims could not be settled without both Baker's and Herron's consent, which neither could withhold unreasonably;

- Baker warranted that he had provided Herron all available information concerning his claims against Mallios, and that such information was true;

- Baker would "fully cooperate in the investigation, pursuit and prosecution" of the claims against Mallios; and

- Herron could terminate the agreement if he determined that prosecution of Baker's claims "would prove not to be economically feasible", in which event Herron would be responsible for fees and other expenses incurred to that point and Baker would owe Herron nothing.

A few days later Herron recommended attorney Darrell D. Minter, and Baker and Minter signed a contract providing that Minter would prosecute Baker's claims against Mallios. The contract stated that Baker would pay attorney fees based on stated hourly rates, as well as costs and expenses. At the same time, however, Baker, Minter, and Herron all signed an agreement that provided:

- Because the hourly rates Baker had agreed to pay Minter were lower than Minter's usual rates, Herron would pay Minter in addition a contingent fee of ten percent of any net recovery by Herron;

- Herron would guarantee payment of all sums due Minter; and

- Minter would look solely to Herron for payment of all sums due.

Minter then filed this lawsuit for Baker against Mallios. Mallios moved for summary judgment on the ground that Baker's prosecution of a legal malpractice claim in which he had assigned Herron an interest contravened public policy because it would encourage the commercial merchandising of such claims. The district court granted Mallios's motion, and Baker appealed. The court of appeals reasoned that if Baker retained ownership of his claim, his assignment to Herron of an interest in any recovery could not involve a marketing of his claim that might transgress public policy considerations.[5] The court noted Baker's insistence that he had not ceded control of the litigation to Herron, that Herron's role was limited to providing financing, and that Baker retained the right of a client to direct his attorney's actions.[6] According to Baker, even Herron's right to approve a settlement would not allow him to prevent a settlement but gave him only a claim for breach of contract if Baker settled without his approval.[7] The court concluded that Baker controlled this litigation to the same extent as if his agreement with Herron did not exist.[8] Determining that Baker's assignment to Herron did not implicate any other policy reasons for disallowing assignments of legal malpractice claims, the court reversed the summary judgment and remanded the case for further proceedings.[9]

5. 971 S.W.2d at 587.

6. *Id.* at 587.

7. *Id.*

8. *Id.*

9. *Id.* at 588.

This Court granted Mallios's petition for review.[10]

## II

I first consider whether Baker's assignment to Herron violates public policy.

### A

The early common law did not allow assignments of choses in action.[11] The two principal explanations offered for this rule are that it prevented litigation like that already prohibited by champerty and maintenance,[12] and that the common law regarded rights as personal.[13] Concerning the former, the great Lord Coke declared that there was an "aversion of the 'sages and founders of our law' to the 'multiplying of contentions and suits'".[14] Concerning the latter, "Holmes argued that rights at common law (and in most early legal systems) were perceived to be relational and situational—that is, determined by the identity of the particular individuals involved and their transaction or circumstances." [15]

An increasingly mercantile world demanded and eventually got the removal of restraints on alienation of debts and other contract rights, which led to an erosion of barriers to assignments of other rights and in other contexts.[16] Now, most American jurisdictions favor assignments of most choses in action, although some jurisdictions—not including Texas—do not allow assignment of personal injury claims.[17] Still, the old caveats about assignments of choses linger. As the Court explained in *State Farm Fire and Casualty Co. v. Gandy:*

> Practicalities of the modern world have made free alienation of choses in action the general rule, but they have not entirely dispelled the common law's reservations to alienability, or displaced the role of equity or policy in shaping the rule. Even today, the general rule is that a contractual assignment may be "inoperative on grounds of public policy". RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(b) (1981). The Restatement notes numerous limitations on alienation of choses in action. *Id.* ch. 15, introductory note. The increase in litigation caused by assignments, noted by Lord Coke, remains a matter of concern. So does the effect of alienability on the parties and circumstances in the original transaction or occurrence. As Holmes succinctly summarized, "[t]he history of early law everywhere shows that the difficulty of transferring a mere right was greatly felt when the situation of fact from which it sprung could not also be transferred. Analysis shows that the difficulty is real." HOLMES, *supra,* at 409.[18]

---

**10.** 42 Tex. Sup. Ct. J. 2 (Oct. 1, 1998).

**11.** *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 705–06 (Tex.1996); *Reef v. Mills Novelty Co.,* 126 Tex. 380, 89 S.W.2d 210, 211 (1936); *Galveston H. & S.A. R.R. v. Freeman,* 57 Tex. 156, 157–58 (1882); *San Antonio & A.P. Ry. v. D.M. Picton & Co.,* 111 S.W.2d 842, 844 (Tex.Civ.App.—San Antonio 1937, writ ref'd); 6A C.J.S. *Assignments* § 6 (1975); 6 AM. JUR. 2D *Assignments* §§ 27, 28 (1963); JAMES B. AMES, *The Inalienability of Choses in Action, in* LECTURES ON LEGAL HISTORY 210, 210–11 (1913); Walter W. Cook, *The Alienability of Choses in Action,* 29 HARV. L.REV. 816, 816 (1916); Roland F. Johnson, Comment, 17 TEXAS L.REV. 183, 184 (1939).

**12.** *Gandy,* 925 S.W.2d at 706; AMES, *supra* note 11, at 211.

**13.** *Gandy,* 925 S.W.2d at 706; AMES, *supra* note 11, at 211 n. 6.

**14.** *Gandy,* 925 S.W.2d at 706; AMES, *supra* note 11, at 211 (quoting Lampet's Case, 77 Eng. Rep. 994, 997 (K.B.1613)).

**15.** *Gandy,* 925 S.W.2d at 706 (citing generally OLIVER W. HOLMES, JR., THE COMMON LAW 340–409 (Boston; Little, Brown, & Co. 1881)).

**16.** *Gandy,* 925 S.W.2d at 706.

**17.** *Id.* at 707.

**18.** *Id.*

**B**

This Court considered the assignment of legal malpractice claims in *Zuniga v. Groce, Locke & Hebdon.*[19] There, the defendant in a products liability suit assigned his claim against his own lawyer to the plaintiffs as part of a settlement of their lawsuit. Observing that "[i]n most jurisdictions one cannot assign a cause of action for legal malpractice",[20] we explained:

Most of the authorities disallowing assignment have reasoned that to allow assignability would make possible the commercial marketing of legal malpractice causes of action by strangers, which would demean the legal profession. This is a legitimate concern. We do not relish the thought of entrepreneurs purchasing the legal rights of clients against their attorneys as an ordinary business transaction in pursuit of profit.[21]

We added, however, that we did not know "the extent to which this fear would be realized if we were to permit assignment, or whether it has been realized in the few states that have already permitted assignment."[22] Instead, our attention in *Zuniga* was directed to the reversal in positions the assignment created in the circumstances of that case. For plaintiffs to have successfully prosecuted a legal malpractice claim against defendant's attorney they would have had to contend that but for the attorney's negligence they would have lost the prior case, a position diametrically opposed to their position in the prior case. We concluded that "[f]or the law to counte-

nance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending on where the money lies, and that litigation is a mere game and not a search for truth."[23] Thus, we held that "an assignment of a legal malpractice action arising from litigation is invalid."[24]

Although the Court recognized in *Zuniga*, as have most other courts faced with the issue, that legal malpractice claims should not be freely marketable, our disapproval of the assignment in that case did not bar all transfers of legal malpractice claims. For example, we recently acknowledged, in *Douglas v. Delp*, that under federal law, a debtor's legal malpractice claims become property of the bankruptcy estate upon filing, to be pursued by the bankruptcy trustee.[25] Also, in *American Centennial Insurance Co. v. Canal Insurance Co.*, we held that an excess insurance carrier could be equitably subrogated to an insured's action against his attorney, as well as the primary carrier, for negligence in handling the defense of the liability claim.[26] We considered this subrogation right to be necessary to prevent the primary carrier and the insured's lawyer from taking unfair advantage of the excess carrier. Although other courts differ on the subject, many have recognized that a person can assert a legal malpractice claim through equitable subrogation.[27] Neither *Douglas*

19. 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd).

20. *Id.* at 315.

21. *Id.* at 316.

22. *Id.*

23. *Id.* at 318 (citing *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 344–45 (Ind.1991)).

24. *Id.*

25. 987 S.W.2d 879, 882 (Tex.1999).

26. 843 S.W.2d 480, 484 n. 6, 484–85 (Tex. 1992).

27. *See Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294, 296–99 (1991); *Chemical Bank of N.J. Nat'l Assoc. v. Bailey*, 296 N.J.Super. 515, 687 A.2d 316, 320–21 (App. Div.1997); *General Accident Ins. Co. of America v. Schoendorf & Sorgi*, 202 Wis.2d 98, 549 N.W.2d 429, 433 (1996); *Great Atlantic Ins. Co. v. Weinstein*, 125 A.D.2d 214, 509 N.Y.S.2d 325, 326–27 (App.Div.1986); *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 177–78 (App.Div.1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984); *National Union Ins. Co. v. Dowd & Dowd*, P.C., 2 F.Supp.2d 1013, 1019–23 (N.D.Ill. 1998) (applying Illinois law); *Allstate Ins. Co.*

nor *American Centennial* involved a commercial marketing of a legal malpractice claim or the concerns such a transfer invokes.

In sum, this Court has disapproved voluntary assignments of legal malpractice claims that necessitate a duplicitous change in the positions taken by the parties in antecedent litigation, and we have expressed reservation about any commercial marketing of legal malpractice claims, but we have not precluded the transfer of such claims to the client's surrogate, such as a bankruptcy trustee, and we have al-lowed equitable subrogation in certain circumstances. Before turning to the assignment in this case, I briefly survey the law in other jurisdictions.

## C

Most American courts that have considered the matter have concluded that voluntary assignments of legal malpractice claims violate public policy.[28] The reasons for this conclusion vary. As to both voluntary and involuntary assignments, courts cite the personal nature of both legal services and the attorney-client relationship,[29]

*v. American Transit Ins. Co.*, 977 F.Supp. 197, 201 (E.D.N.Y.1997) (applying New York law); *Ohio Cas. Ins. Co. v. Southland Corp.*, No. CIV.A. 98–CV–6187, 1999 WL 236733, at *3 (E.D.Pa. Apr.22, 1999). *But see Bank IV Wichita Nat'l Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 827 P.2d 758, 766 (1992) (rejecting a creditor bank's claim to subrogation); *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg*, 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424, 430 (1994); *National Union Fire Ins. Co. v. Salter*, 717 So.2d 141, 142–43 (Fla.Dist.Ct.App.1998); *American Continental Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12, 14 (Ky.Ct.App.1999)(opinion not final); *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279 (5th Cir.1991) (applying Louisiana law); *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 106–07 (2d Cir.1991) (applying Connecticut law).

**28.** *See, e.g., Jackson v. Rogers & Wells*, 210 Cal.App.3d 336, 258 Cal.Rptr. 454, 457–58 (1989); *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 86–87 (1976); *Roberts v. Holland & Hart*, 857 P.2d 492, 495–96 (Colo.Ct.App.1993); *Forgione v. Dennis Pirtle Agency, Inc.*, 701 So.2d 557, 559 (Fla.1997) (noting that "Florida law views legal malpractice actions as a personal tort which cannot be assigned because of 'the personal nature of legal services which involve highly confidential relationships'" (quoting *Washington v. Fireman's Fund Ins. Co.*, 459 So.2d 1148, 1149 (Fla.Dist.Ct.App. 1984))); *Brocato v. Prairie State Farmers Ins. Ass'n*, 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200, 1201–02 (1988), appeal denied, 121 Ill.2d 567, 122 Ill.Dec. 434, 526 N.E.2d 827; *Clement v. Prestwich*, 114 Ill. App.3d 479, 70 Ill.Dec. 161, 448 N.E.2d 1039, 1041–42 (1983); *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 339–45 (Ind.1991); *Coffey v. Jef-ferson County Bd. of Educ.*, 756 S.W.2d 155, 157 (Ky.Ct.App.1988); *Beaty v. Hertzberg & Golden, P.C.*, 456 Mich. 247, 571 N.W.2d 716, 721 (1997); *American Employers' Ins. Co. v. Medical Protective Co.*, 165 Mich.App. 657, 419 N.W.2d 447, 448–49 (1988); *Moorhouse v. Ambassador Ins. Co.*, 147 Mich.App. 412, 383 N.W.2d 219, 221 (1985); *Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736, 738–39 (1983); *Wagener v. McDonald*, 509 N.W.2d 188, 190–93 (Minn.Ct.App.1993); *White v. Auto Club Inter–Ins. Exch.*, 984 S.W.2d 156, 156–60 (Mo.Ct.App.1998); *Community First State Bank v. Olsen*, 255 Neb. 617, 587 N.W.2d 364, 368 (1998); *Earth Science Labs., Inc. v. Adkins & Wondra, P.C.*, 246 Neb. 798, 523 N.W.2d 254, 256–57 (1994); *Andersen v. Ganz*, 6 Neb.App. 224, 572 N.W.2d 414, 418–19 (1997); *Chaffee v. Smith*, 98 Nev. 222, 645 P.2d 966, 966 (1982); *Alcman Servs. Corp. v. Bullock*, 925 F.Supp. 252, 258–60 (D.N.J. 1996) (interpreting New Jersey and Pennsylvania law); *Can Do, Inc. Pension & Profit Sharing Plan v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 868–70 (Tenn.1996); *MNC Credit Corp. v. Sickels*, 255 Va. 314, 497 S.E.2d 331, 333–34 (1998). *See also* 1 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRAC-TICE § 7.8, at 502–05 (4th ed.1996); Tom W. Bell, *Limits on the Privity and Assignment of Legal Malpractice Claims*, 59 U. CHI. L.REV. 1533, 1540–43 (1992); Francis M. Dougherty, Annotation, *Assignability of Claim for Legal Malpractice*, 40 A.L.R.4th 684, 687 (1986, Supp.1997); Michael Sean Quinn, *On the Assignment of Legal Malpractice Claims*, 37 S. TEX. L.REV. 1203, 1204 (1996).

**29.** *See Washington*, 459 So.2d at 1149 (quoted with approval in *Forgione*, 701 So.2d at 559); *Christison v. Jones*, 83 Ill.App.3d 334, 39 Ill. Dec. 560, 405 N.E.2d 8, 10–12 (1980); *Weber*, at 14; *Protective*, 419 N.W.2d at 448; *Moor-house*, 383 N.W.2d at 221; *Joos*, 338 N.W.2d

as well as the preservation of the attorney-client privilege,[30] as justifications for disallowing assignments of such claims. Courts have also expressed concern that assignments will lead to commercial marketing of claims and increased litigation,[31] resulting in increased costs of malpractice insurance and increased costs in legal services.[32] Further, courts have cautioned that the possibility of a client's assignment of a claim to an adversary will require the client and adversary to reverse positions in the malpractice suit,[33] will promote collusion,[34] and will temper the attorney's zeal, loyalty, and independent judgment in representing his client so as to avoid offense to the adversary or the risk that a third party will incite his client against him.[35]

The commercial marketing concern—the focus of the parties' arguments in the present case—was explained in the first case to consider the assignability of legal malpractice claims, *Goodley v. Wank & Wank, Inc.*[36] The plaintiff in that case had taken an assignment of a woman's claims against her attorneys for their conduct of her divorce. The court's opinion does not indicate that the plaintiff was related to his assignor or involved in her divorce. The court refused to allow the assignee to prosecute the claims, explaining:

It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious

at 738–39; *Wagener*, 509 N.W.2d at 190–91; *Community First State Bank v. Olsen*, 255 Neb. 617, 587 N.W.2d 364 (1998); *Earth*, 523 N.W.2d at 257.

30. *See Kracht v. Perrin, Gartland & Doyle*, 219 Cal.App.3d 1019, 268 Cal.Rptr. 637, 640–41 n. 6 (1990); *Appletree*, 559 N.W.2d at 713; *Wagener*, 509 N.W.2d at 191; *Olsen*, 587 N.W.2d at 368; *Earth*, 523 N.W.2d at 257; *Alcman*, 925 F.Supp. at 258; *Can Do*, 922 S.W.2d at 868–69.

31. *See Jackson*, 258 Cal.Rptr. at 461; *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 709 F.Supp. 44, 50 n. 7 (D.Conn. 1989); *Brocato*, 117 Ill.Dec. 849, 520 N.E.2d at 1202; *Clement*, 70 Ill.Dec. 161, 448 N.E.2d at 1041–42; *Christison*, 39 Ill.Dec. 560, 405 N.E.2d at 11; *Protective*, 419 N.W.2d at 448; *Moorhouse*, 383 N.W.2d at 221; *Joos*, 338 N.W.2d at 738–39; *Appletree*, 559 N.W.2d at 713; *Wagener*, 509 N.W.2d at 191; *Alcman*,

925 F.Supp. at 258; *Can Do*, 922 S.W.2d at 868–69.

32. *See also* 1 MALLEN & SMITH, *supra* note 28, § 7.8, at 504–05; Quinn, *supra* note 28, at 1208–33.

33. *See Jackson*, 258 Cal.Rptr. at 460; *Alcman*, 925 F.Supp. at 257.

34. *Picadilly*, 582 N.E.2d at 343; *Coffey v. Jefferson County Bd. of Ed.*, 756 S.W.2d 155, 157 (Ky.Ct.App.1988); *Wagener*, 509 N.W.2d at 191; *Alcman*, 925 F.Supp. at 258.

35. *See Picadilly*, 582 N.E.2d at 342; *Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294, 296–97 (1991); *Protective*, 419 N.W.2d at 448; *Wagener*, 509 N.W.2d at 191; *Can Do*, 922 S.W.2d at 869; *see also* 1 MALLEN & SMITH, *supra* note 28, § 7.8, at 504–05; Quinn, *supra* note 28, at 1208–33.

36. 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976).

intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.[37]

A number of courts have echoed *Goodley* 's concern that assignments of legal malpractice claims would lead to commercial marketing of such claims.[38] Even when courts have upheld assignments of legal malpractice claims as part of a larger transaction, they have distinguished such situations from commercial marketing of claims.[39]

None of the handful of cases that have allowed a transfer or assignment of a malpractice action has involved a purely commercial marketing of a claim like the one here. Rather, these cases involve, for example, transfers in connection with: equitable subrogation;[40] the purchase of a business, its property, or its assets and obligations;[41] federal regulatory or bankruptcy statutes;[42] executions by a judgment creditor;[43] and settlements with the

**37.** *Id.* at 87.

**38.** *See, e.g., Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114, 118 (Ariz.Ct.App.1984); *Jackson*, 258 Cal.Rptr. at 458 (Cal.Ct.App. 1989); *Roberts v. Holland & Hart*, 857 P.2d 492, 495–96 (Colo.Ct.App.1993); *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 709 F.Supp. 44, 50 n. 7 (D.Conn. 1989); *Brocato v. Prairie State Farmers Ins. Ass'n*, 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200, 1202 (1988); *Clement v. Prestwich*, 114 Ill.App.3d 479, 70 Ill.Dec. 161, 448 N.E.2d 1039, 1041–42 (1983); *Christison v. Jones*, 83 Ill.App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8, 11 (1980); *Picadilly*, 582 N.E.2d at 341–42; *Moorhouse v. Ambassador Ins.*, 147 Mich.App. 412, 383 N.W.2d 219, 221 (1985); *Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736, 738 (1983); *Appletree Square I v. O'Connor & Hannan*, 559 N.W.2d 711, 713 (Minn.Ct.App.1997); *Wagener*, 509 N.W.2d at 191; *Alcman*, 925 F.Supp. at 258; *Can Do*, 922 S.W.2d at 868–69; *MNC Credit Corp. v. Sickels*, 255 Va. 314, 497 S.E.2d 331, 333–34 (1998).

**39.** *See, e.g., Cerberus Partners, L.P. v. Gadsby & Hannah*, 728 A.2d 1057, 1059 (R.I.1999); *Thurston v. Continental Cas. Co.*, 567 A.2d 922, 923 (Me.1989); *Richter v. Analex Corp.*, 940 F.Supp. 353, 358 (D.D.C.1996).

**40.** *See National Union Ins. Co. v. Dowd & Dowd, P.C.*, 2 F.Supp.2d 1013, 1016 (N.D.Ill. 1998); *Bell*, 475 N.W.2d at 296; *Chemical Bank of N.J. Nat'l Ass'n v. Bailey*, 296 N.J.Super. 515, 687 A.2d 316, 320 (1997); *Great Atlantic Ins. Co. v. Weinstein*, 125 A.D.2d 214, 509 N.Y.S.2d 325, 326 (N.Y.App.Div.1986); *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 177 (1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984); *Allstate Ins. Co. v. American Transit Ins. Co.*, 977 F.Supp. 197, 201 (E.D.N.Y.1997) (applying New York law); *Ohio Cas. Ins. Co. v. Southland Corp.*, No. CIV.A. 98–CV–6187, 1999 WL 236733, at *3 (E.D.Pa. Apr.22, 1999); *General Accident Ins. Co. of Am. v. Schoendorf & Sorgi*, 202 Wis.2d 98, 549 N.W.2d 429, 433 (1996).

**41.** *See Richter*, 940 F.Supp. at 357–58; *Hedlund Mfg. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357, 358 (1988); *Cerberus*, 728 A.2d at 1059.

**42.** *See Federal Deposit Ins. Corp. v. Martin*, 770 F.Supp. 623, 625 (M.D.Fla.1991) (FDIC as receiver of failed bank); *RTC Mortgage Trust 1994 N–1 v. Fidelity Nat'l Title Ins. Co.*, 16 F.Supp.2d 557, 559–60 (D.N.J.1998) (RTC's assignees); *In re Porter McLeod, Inc.*, 231 B.R. 786, 801 (D.Colo.1999) (assignment of claims between bankruptcy trustees); *Ellwanger v. Budsberg (In re Ellwanger)*, 140 B.R. 891, 894 (Bankr.W.D.Wash.1992) (bankruptcy); *Collins v. Federal Land Bank of Omaha*, 421 N.W.2d 136, 138 (Iowa 1988) (bankruptcy). *See also C–Power Products, Inc. v. Schiro (In re C–Power Products)*, 230 B.R. 800, 802, 803 (Bankr.N.D.Tex.1998) (holding that postpetition malpractice claims against counsel for debtor-in-possession become property of the estate, but could not be transferred by "sale" to a third party); *In re J.E. Marion Inc.*, 199 B.R. 635, 637 (Bankr.S.D.Tex.1996) (stating that legal malpractice claims were "property of the estate," but trustees, as a matter of public policy, could not assign claims to a creditor group for prosecution).

**43.** *See Bergen v. F/V St. Patrick*, 686 F.Supp. 786, 788 (D.Alaska 1988); *Vitale v. City of New York*, 183 A.D.2d 502, 583 N.Y.S.2d 445, 446 (N.Y.App.Div.1992); *Ikuno v. Yip*, 912 F.2d 306, 314 (9th Cir.1990) (Washington

opposing party.[44] (As already explained, this Court in *Zuniga* has refused to allow assignments in the latter situation.[45])

Thus, for example, in *Thurston v. Continental Casualty Co.*,[46] the Maine Supreme Court allowed a corporate defendant in a products liability suit to assign to the plaintiff its malpractice claim against its attorney to settle the plaintiff's claims against the shareholders of the corporation. The court did not discuss the role-reversal problem that we concluded in *Zuniga* should prohibit such an assignment, but the court did stress: "We are not here confronted with the establishment of a general market for such claims; this assignee has an intimate connection with the underlying lawsuit."[47] Later, in *New England Mortgage Services Co. v. Petit*,[48] the same court refused to allow a judgment creditor a lien on a judgment debtor's legal malpractice claim unrelated to the proceeding in which the judgment was rendered. The court reasoned that the judgment debtor could not voluntarily assign the claim to the judgment creditor "because the latter has neither the intimate connection nor the clear interest in the claim necessary to become a party to that [legal malpractice] action," citing *Thurston*.[49] Because the claim could not

be voluntarily assigned, it could not be involuntarily attached.[50] *Thurston* and *New England Mortgage* make clear that Maine does not permit a person to assign a legal malpractice claim to a complete stranger.

The Rhode Island Supreme Court's recent decision in *Cerberus Partners, L.P. v. Gadsby & Hannah*[51] illustrates best the careful restrictions courts have imposed in upholding transfers of legal malpractice claims. There, financial institutions purchased loans, and all attendant rights, from the original lenders. It turned out that security for the loans had not been perfected, and the purchasers were forced to settle with the borrower in bankruptcy for less than the balance owed. The purchasers then sued the original lenders' lawyers for failing to perfect the security interests for the loans. The court held that "where an assignee of a commercial loan agreement brings a legal malpractice action against the attorney who represented the original lender in the commercial loan transaction, the assignment of that negligence claim, if arising from the assigned commercial loan agreement, is not prohibited by Rhode Island law."[52] The court likened the situation to that in *Richter v. Analex Corp.*[53] and *Hedlund Manu-*

state law); *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 980 P.2d 208, 210 (Utah 1999).

**44.** *See Thurston v. Continental Cas. Co.*, 567 A.2d 922, 923 (Me.1989); *New Hampshire Ins. Co., Inc. v. McCann*, 429 Mass. 202, 707 N.E.2d 332, 333 (Mass.1999); *Greevy v. Becker, Isserlis, Sullivan & Kurtz*, 240 A.D.2d 539, 658 N.Y.S.2d 693, 694 (N.Y.App.Div.1997); *Chang v. Chang*, 226 A.D.2d 316, 642 N.Y.S.2d 628, 629 (N.Y.App.Div.1996); *Tawil v. Finkelstein Bruckman Wohl Most & Rothman*, 223 A.D.2d 52, 646 N.Y.S.2d 691, 692 (N.Y.App.Div.1996); *Oppel v. Empire Mut. Ins. Co.*, 517 F.Supp. 1305, 1306 (S.D.N.Y. 1981); *Collins v. Fitzwater*, 277 Or. 401, 560 P.2d 1074, 1076 (1977), *overruled on other grounds, Lancaster v. Royal Ins. Co.*, 302 Or. 62, 726 P.2d 371, 374–75 (1986); *Ammon v. McCloskey*, 440 Pa.Super. 251, 655 A.2d 549, 551 (1995). *Cf. Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 757–58 (Alaska 1992) (distinguishing partial assignment of proceeds of malpractice action,

as part of "loan receipt agreement" with settling defendant, from an assignment).

**45.** *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex.1994).

**46.** 567 A.2d 922 (Maine 1989).

**47.** *Id.* at 923.

**48.** 590 A.2d 1054 (Maine 1991).

**49.** *Id.* at 1056.

**50.** *Id.*

**51.** 728 A.2d 1057 (R.I.1999).

**52.** *Id.* at 1059.

**53.** 940 F.Supp. 353 (D.D.C.1996) (stating that "[t]he courts that have barred the assignment of legal malpractice claims have relied pri-

*facturing Co. v. Weiser, Stapler & Spivak*,[54] both cases allowing assignments of legal malpractice claims attendant to purchases of business assets and liabilities. The court emphasized, however, that "plaintiffs did not merely purchase the legal malpractice claim"[55] and that the court was "not dealing here with a situation where a legal malpractice claim was transferred to a person without any other rights or obligations being transferred with it."[56] The court explained:

> We acknowledge the distinction between market assignments involving purely economic transactions, such as involved in the case before us, and freestanding malpractice personal injury claim assignments that necessarily involve and invoke the unique lawyer-client relationship and duty of confidentiality; privity, and the duty of the lawyer that runs only to the client; the creation of possible commercial markets for such claims; and the demeaning of the legal profession along with the prospect of having attorneys defend themselves against strangers and the possibility of being forced to divulge confidential lawyer-client information in defending against assigned claims....

We are persuaded of the soundness of the reasoning employed by those courts in jurisdictions that have distinguished between the voluntary assignment of a bare legal claim for malpractice and the assignment of a claim for malpractice that is part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations.[57]

The court thus distinguished a transfer of a legal malpractice claim as part of the related rights and obligations in another transaction from a simple sale of a claim to an investor, the situation before us now.

None of the cases supports an assignment of a malpractice claim purely as an investment. In fact, I am aware of only one court that has discounted concerns about the commercial marketing of malpractice claims. In *New Hampshire Insurance Co. v. McCann*, the Massachusetts Supreme Judicial Court wrote:

> We suspect that fear of "open trading" is based in part on outmoded concepts and protectionism. We "have long abandoned the view that litigation is suspect," and have recently abolished the rule against champerty, now permitting the litigation of claims financed by others in return for their receipt of a portion of the proceeds of the litigation. There is nothing to show that, in those jurisdictions that permit the voluntary assignment of a malpractice claim, there has been an increase in baseless lawsuits.[58]

The court does not say what jurisdictions permit a commercial marketing of legal malpractice claims, and I know of none, including Massachusetts. Indeed, the court stressed that the case before it did not involve the commercial marketing of claims, stating that "[t]his case does not raise the specter of open trading of legal malpractice claims,"[59] and again, "[w]e do not have an assignment which opens the doors to a general market for legal malpractice claims."[60] It therefore comes as no surprise that there is little evidence of baseless litigation as a result of such com-

---

marily on factors not present in this case, including the fear that parties will sell off claims, particularly to opponents or completely unrelated third parties, and a concern about jeopardizing the personal nature of legal services").

**54.** 517 Pa. 522, 539 A.2d 357 (1988).

**55.** 728 A.2d at 1059.

**56.** *Id.*

**57.** *Id.* at 1060.

**58.** 429 Mass. 202, 707 N.E.2d 332, 337 (1999) (citation omitted).

**59.** *Id.* at 337.

**60.** *Id.* at 338.

mercial marketing of claims; indeed, since the practice is nowhere permitted, it would be surprising if there were *any*. Nor is it surprising that there has been no increase in baseless litigation in jurisdictions that permit assignments of legal malpractice claims only in the context of other transactions. The cases I have cited illustrate that claims are usually asserted in such situations in combination with or to protect other rights.

In sum: First, most jurisdictions that have considered the assignability of legal malpractice claims have broad prohibitions against such assignments under any circumstances, based in part on concerns that such claims not be commercially marketed for purely investment purposes, what this Court referred to in *Zuniga* as "entrepreneurs purchasing the legal rights of clients against their attorneys as an ordinary business transaction in pursuit of profit." [61] Second, the courts that have allowed assignments in various circumstances have emphasized, or at least noted, the distinctions between the permitted assignment and claims marketed commercially for investment purposes. Third, no reported decision in an American jurisdiction has upheld a transfer of a legal malpractice claim purely as an investment.

### D

One of the common law's reservations to assignment of choses—that some rights cannot fairly be asserted by strangers to the parties and their circumstances—is implicated by an assignment of a legal malpractice case if the assignee takes more of an interest in the claim than merely a share of any recovery. If the assignor conveys so much of any recovery or makes other concessions that he cedes substantial control of the litigation to the assignee, the assignee may insist that the assignor take positions against his former attorney with which he is uncomfortable or face allega-

tions by the assignee that he is breaching the assignment agreement. An assignee may be more willing to risk sanctions or counterclaims and may be in a position to insist that the assignor do the same or suffer the allegation of refusal to cooperate. If in the course of the litigation the assignor faces giving evidence detrimental to his position, the assignee may accuse the assignor of misrepresenting the strength of the claim at the outset. In short, an assignee who has not only a financial stake in the outcome of the case but substantial ownership and control of the claim itself can require the assignor to take positions the assignor would not otherwise take. While this concern is not identical to the one we expressed in *Zuniga*, it is related. The concern has caused courts from *Goodley* on to conclude that commercial merchandising of legal malpractice claims is likely to lead to confusion and conflict in the resulting litigation.

The two principal justifications for freely assignable legal malpractice claims are access to financing to prosecute such claims and consistency with the treatment of other choses of action. The first is undercut by the contingent fee, which allows impecunious clients with meritorious claims to retain counsel. It is not at all clear that unrestricted assignments will supply resources to help assure that meritorious claims are litigated that contingent fee arrangements do not already provide. As for the second justification, the assignability of some choses in action does not require that all choses be assignable. As I have already noted, assignments of choses are still restricted in various contexts for policy reasons.

In Texas, as in most states, a lawyer may not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, other than a lien to secure payment of his fee and expenses, and a contingent fee allowed by law.[62] The proposed final

---

61. 878 S.W.2d at 316.

62. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(h). *See* RESTATEMENT OF THE LAW GOVERNING LAWYERS § 48 (Proposed Final Draft No. 1, 1996).

draft of the *Restatement of the Law Governing Lawyers* explains the reason for this rule:

> The justification for the rule ... is that a lawyer's ownership gives the lawyer an economic basis for claiming to control the prosecution and settlement of the claim and provides an incentive to the lawyer to relegate the client to a subordinate position. The risk in such an arrangement is greater than it would be with a contingent fee; a contingent fee—in addition to being limited in most cases to well less than half of the recovery—is clearly designated as payment for the lawyer's services rendered for the client.[63]

The reasons for prohibiting a lawyer from acquiring an interest in his client's claim, other than a contingent fee for services provided, that allows the lawyer to control prosecution of the claim apply as well to non-lawyers.

An assignment of a part of any recovery on a claim to a person other than the lawyer prosecuting the claim does not, by itself, raise the danger that the assignee will attempt to control the litigation. Thus, for example, a person may obtain a loan to finance prosecution of a claim and pledge the proceeds as security for repayment without necessarily ceding significant control of the litigation to the lender. Only a person who takes so great a stake in a claim that he in essence owns it, or who, in effect, invests in a claim, obtaining at the same time significant rights to protect the investment, raises the problems involved in commercially marketing claims.

For these reasons, I would conclude that an assignment of an interest in a legal malpractice claim is contrary to public policy if the assignee takes the interest purely as an investment unrelated to any other transaction and acquires not merely a financial interest in the outcome but a significant right of control over the prosecution of the claim.

## E

Whether Baker has ceded to Herron a significant right of control over the prosecution of the claim against Mallios depends on the agreements between them. I therefore disagree with the appellate court's concern that "whether Baker has ceded control of the litigation to Herron is a matter that is not fully developed."[64]

I also disagree with the appellate court's conclusion that Baker "controls the litigation to the same extent that a client in a case not involving an assignment controls the litigation."[65] Baker cannot settle his claim without Herron's consent. Baker has, therefore, ceded to Herron some control over the prosecution of the malpractice claim.

Herron's agreement with Baker gives him additional means of controlling the litigation. Herron's right to recommend legal counsel and to negotiate the terms of employment, although subject to Baker's approval, gives Herron more sway over the lawsuit. Baker is obliged to "fully cooperate in the investigation, pursuit and prosecution" of the claim against Mallios. Herron's contractual right to insist on Baker's full cooperation allows him to demand that Baker take or not take certain positions. Herron's unilateral right to terminate the agreement if he decides that prosecution of Baker's claims "would prove not to be economically feasible" provides additional incentive to Baker to comply with Herron's wishes. Baker's warranty that he has accurately and truthfully conveyed to Herron the facts concerning his claim threatens consequences should less favorable evidence be elicited.

Herron's control of the litigation is enhanced by his contractual relationship with

**63.** RESTATEMENT OF THE LAW GOVERNING LAWYERS § 48, cmt. b, at 181 (Proposed Final Draft No. 1, 1996).

**64.** 971 S.W.2d 581, 587.

**65.** *Id.*

Minter. Baker's counsel, Minter, has agreed to look only to Herron for payment of his fee, and has a contingent interest in Herron's recovery. It blinks reality to think that Minter will not consider himself as much or more accountable to Herron than to Baker.

The arrangement among Baker, Herron, and Minter is not merely to provide financing for prosecution of Baker's claim against Mallios. Most telling is the fact that Baker has no obligation to repay fees and costs expended by Herron. Minter's sole source of payment is Herron, and Herron's sole source of recompense is from any recovery obtained from Mallios. Herron's assumption of all responsibility for the expense of prosecuting Baker's claim is not a loan, like a bank might make, but an investment. Baker has not merely assigned Herron an interest in any recovery; rather, he has marketed his legal malpractice claim to Herron, a practice we concluded in *Zuniga* contravened public policy. To allow an assignment like the one here is to approve of the commercial marketing of legal malpractice claims, a result that other courts confronted with the issue have rejected. I am not aware of any case approving an assignment in circumstances like those before us. I would therefore hold that Baker's assignment to Herron is invalid.

### F

I need respond to JUSTICE ENOCH only briefly.

JUSTICE ENOCH argues that the Legislature has approved assignments of legal claims in section 12.014(a) of the Property Code, which states:

> A judgment or part of a judgment of a court of record or an interest in a cause of action on which suit has been filed may be sold, regardless of whether the judgment or cause of action is assigna-

ble in law or equity, if the transfer is in writing.

The statute does not, of course, apply in the present case because Baker did not assign Herron an interest in a judgment or a cause of action on which suit had been filed; rather, Baker assigned Herron an interest in a cause of action *to be filed.* More importantly, we have held that this statute does not either validate or invalidate assignments of causes of action but simply provides for notice. Thus, we explained in *Mitchell, Gartner & Thompson v. Young:*

> "The purpose of this statute is merely to furnish parties dealing with the cause notice of the assignments, and it is not intended that it should affect the validity of any sale of a cause of action, or any part thereof, or the sale of a judgment." [66]

In *Zuniga,* we disallowed assignments of legal malpractice claims in certain circumstances without regard to section 12.014(a), not because it escaped our attention, but because it is irrelevant.

JUSTICE ENOCH suggests that my views are " 'based in part on outmoded concepts of protectionism,' " [67] thereby dismissing the scores of cases I have cited. His modern view has yet to find support in a single reported decision in any jurisdiction of which either of us is aware.

### III

The question remains whether Baker can prosecute his claim against Mallios despite the invalid assignment to Herron. Mallios argues that to allow Baker to prosecute his claim would be to condone the assignment to Herron, thereby encouraging other such assignments. Like the Court, I do not agree. If the assignment is invalid, neither Baker nor Herron can enforce his rights under it. Without a contractual prospect of recovery on Baker's claim, Herron presumably would have

**66.** 135 S.W.2d 308, 311 (Tex.Civ.App.—Fort Worth 1939, writ ref'd).

**67.** *Post* at 172.

no incentive to continue to finance the litigation. Herron would certainly have no ability to control the litigation. Once the assignee's control over the litigation is vitiated, the law's concerns would be removed. It would be unfair to punish Baker for executing the assignment by depriving him of his claim against Mallios altogether.

\* \* \* \* \*

Accordingly, for the reasons I have explained, I would affirm the judgment of the court of appeals.

Justice ENOCH, joined by Chief Justice PHILLIPS, concurring.

I join the Court's opinion. I write separately because I do not share Justice Hecht's view that so-called "commercial" legal malpractice claim assignments are against public policy.

As the Court correctly states, the arrangement between Baker and Herron does not implicate the concerns about collusion and position-shifting we expressed in *State Farm Fire and Casualty Co. v. Gandy*[1] and *Zuniga v. Groce, Locke & Hebdon.*[2] On remand, just as before, Baker's position, that Mallios committed legal malpractice by suing the wrong defendant, will be the same as if he had no agreement with Herron.

Moreover, I can think of no good reason why "commercial" assignments of legal malpractice claims should be declared void as against public policy. Texas law favors free assignment of claims. Indeed, for over 100 years the Texas Legislature has expressly recognized that the *sale* of claims in Texas is permissible. Section 12.014 of the Texas Property Code, which has existed in roughly the same form since 1889, provides that "an interest in a cause of action on which suit has been filed *may be sold,* regardless of whether the . . . cause of action is assignable in law or equity, if the transfer is in writing."[3]

Justice Hecht dismisses this Property Code section as a "simpl[e] . . . notice [provision]" and declares it "irrelevant."[4] True, section 12.014(a) is a notice provision. But it is far from irrelevant. Why would the Legislature pass a notice provision for an act—selling a claim—that violates public policy? That the Legislature passed a provision governing how notice of a claim's sale is to be given, rather than barring the sale altogether, may mean a number of things. But it must mean, at least, that the act of selling a claim is not, in itself, against Texas public policy.[5]

Nonetheless, Justice Hecht articulates the view that sale of legal malpractice claims is bad. While I agree with the Court that disposition of this case does not turn on that issue, I feel constrained to point out, given Justice Hecht's writing, that I share the Massachusetts Supreme Judicial Court's suspicion that "fear of 'open trading' is based in part on outmoded concepts and protectionism."[6]

Finally, I disagree with Justice Hecht asking a question to which, he insists, Herron is "entitled to an answer."[7] For one, Herron isn't here, and never asked us to pass on whether his agreement with Baker is enforceable.

Moreover, Justice Hecht's speculation about whether Baker would choose to continue to pursue his claim if we were to declare, despite Herron's absence from this proceeding, that Herron cannot fi-

1. 925 S.W.2d 696 (Tex.1996).

2. 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd).

3. Tex. Prop.Code § 12.014(a) (emphasis added) (first passed in 1889 as article 6833 of the Texas Revised Civil Statutes).

4. 11 S.W.3d at 171 (Hecht, J., concurring).

5. *See McCloskey v. San Antonio Traction Co.,* 192 S.W. 1116, 1119–20 (Tex.Civ.App.—San Antonio 1917, writ ref'd).

6. *New Hampshire Ins. Co. v. McCann,* 429 Mass. 202, 707 N.E.2d 332, 337 (1999).

7. 11 S.W.3d at 160 (Hecht, J., concurring).

nance the claim, is just that—speculation. It seems at least as likely to me, though I am careful to note the record is silent on this point, that in such an event Baker still might want to pursue his claim.

The summary judgment evidence is that Baker originally went to Herron not to secure financing for a claim, but because Herron advertised that he buys judgments and Baker had a judgment in his pocket that Mallios was not collecting for him. Arguably, that's when Baker first learned he had a claim against Mallios. Why guess that, under Justice Hecht's scenario, he would abandon it? In any event, it is fortunate that the Court has chosen to decide this case not on "what-ifs," but on the record as presented.

With these remarks, I join fully the Court's opinion.