Steven DEFTERIOS and Henry
S. Miller Commercial Co.,
Appellants,

v.

DALLAS BAYOU BEND, LTD.; Dallas Clubview Gardens, L.P.; Pecan Square, Ltd.; Woodside Apartments, L.P.; BNC Regency Walk, L.P., BN Regency, L.L.C., BNC Lake Jackson Village, L.P., Appellees.

No. 05–08–01726–CV.

Court of Appeals of Texas,
Dallas.

Aug. 19, 2011.

P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for Appellants.

Marc R. Stanley, Stanley, Mandel & Iola, L.L.P., Roger L. Mandel, Beckham & Mandel, P.C., Dallas, for Appellees.

Before Justices FITZGERALD, LANG–MIERS, and FILLMORE.

## OPINION

Opinion By Justice LANG–MIERS.

Appellees are commercial property owners that sued appellants Henry S. Miller Commercial Co. and Steven Defterios, a real estate broker for Henry S. Miller, for fraud in the inducement, fraud, and negli-

gent misrepresentation.[1] Only the fraud and negligent misrepresentation claims were submitted to the jury. The jury found appellants liable and assessed damages. On appeal, appellants do not challenge the jury's liability findings. In three issues, they argue that the evidence is legally and factually insufficient to support the damages and that the types of damages awarded are not recoverable as a matter of law. For the following reasons, we modify the trial court's judgment and affirm as modified.

## BACKGROUND

Appellees are limited partnerships and limited liability companies established by Barry Nussbaum or his company BNC Real Estate to buy, renovate, and sell commercial apartment complexes and office buildings on behalf of individual investors. Each appellee owned a specific property that is the subject of this lawsuit. BNC managed the properties.

In March 2004, Nussbaum's real estate broker received a call from Defterios stating that his client James A. Flaven was interested in purchasing properties in BNC's portfolio. Defterios told Nussbaum[2] that Flaven was the beneficiary of a multimillion dollar trust fund and wanted to use those trust funds to purchase the properties. Flaven eventually signed contracts on nine of those properties. The contracts contained an initial closing date of August 2004; however, the closing dates were rescheduled numerous times because appellees were told that Flaven had difficulty obtaining funds from the trust. Defterios told Nussbaum that the problem appeared to be that the trust was not releasing the funds. Defterios also told Nussbaum that Flaven and his family were very private people and only Defterios was allowed to speak to the trust fund manager.

On many occasions, Defterios told Nussbaum that Defterios had verified the existence of the funds and that the closings were imminent. Over a year after the contracts were signed, however, the deals still had not closed. At that time, Nussbaum came to believe that Flaven did not have the financial resources to close on the properties and that all of appellants' representations about Flaven and the trust fund had been false. As it turned out, Flaven was a Massachusetts truck driver and was not the beneficiary of a multimillion dollar trust fund; he never closed on the contracts. Some of the properties were deeded to the lender banks in lieu of foreclosure and others were sold for a loss. Many of the individual investors in the properties lost all the savings they had invested in the properties. The jury found no direct benefit-of-the-bargain damages, but awarded over $12 million in consequential damages to appellees for fraud and negligent misrepresentation.

## LEGAL AND FACTUAL SUFFICIENCY CHALLENGES

In issue one, appellants argue that the evidence is legally and factually insufficient to support a finding that their representations proximately caused the damages.

### Standard of Review

▆▆▆ When a party challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *See City of*

1. This appeal was previously abated pending the resolution of bankruptcy proceedings.

2. Some of Defterios's conversations were with Nussbaum and some were with Nussbaum's broker.

*Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *Id.* at 827. If the evidence would permit reasonable and fair-minded people to reach the finding under review, the legal sufficiency challenge fails. *Id.* When a party challenges the factual sufficiency of the evidence, we consider all of the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and manifestly unjust. *Id.* In conducting our review, we are mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819; *Hinkle v. Hinkle,* 223 S.W.3d 773, 782 (Tex.App.-Dallas 2007, no pet.).

## Preservation of Error

■■ Appellees contend that many of appellants' challenges to the sufficiency of the evidence were not preserved. We do not agree. To preserve a legal sufficiency challenge for appeal after a jury trial, a party must move for an instructed verdict; object to the submission of the jury question; or move for a judgment notwithstanding the verdict, to disregard the jury finding, or for a new trial. *DFW Aero Mechanix, Inc. v. Airshares, Inc.,* —— S.W.3d ——, ——, 2010 WL 2524589 (Tex. App.-Dallas 2010, no pet.). To preserve a factual sufficiency challenge for appeal, a party must present the specific complaint to the trial court in a motion for new trial. TEX.R. CIV. P. 324(b)(2), (3); *Aero Mechanix,* —— S.W.3d at ——.

■ Appellants filed a motion for judgment notwithstanding the verdict in which they argued that there was no evidence that appellants' representations were related to or resulted in the damages or that the damages were foreseeable to them. We conclude that the motion for judgment notwithstanding the verdict was sufficient to preserve appellants' legal sufficiency challenges. *See Arkoma Basin Exploration Co., Inc. v. FMF Assoc. 1990–A, Ltd.,* 249 S.W.3d 380, 387–88 (Tex.2008). Appellants also filed a motion for new trial in which they challenged the factual sufficiency of the evidence to support each award of damages to appellees; the factual sufficiency of the evidence to support the finding that each of the damages awarded by the jury was reasonably foreseeable to appellants; and the factual sufficiency of the evidence to support the finding that each award of damages was proximately caused by appellants' wrongful conduct. We conclude that the motion for new trial was sufficient to preserve the factual sufficiency complaints. *See In re R.D.,* 304 S.W.3d 368, 370 (Tex.2010).

## Consequential Damages

■ Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful conduct. *See Arthur Andersen v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex.1997). Consequential damages must be foreseeable and directly traceable to the defendant's wrongful act and result from it. *Id.* (citing *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex.App.-El Paso 1992, writ denied)). In other words, the consequential damages must be proximately caused by the wrongful conduct. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 n. 1 (Tex.1998); *Henry S. Miller v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983).

■ The elements of proximate cause are cause-in-fact and foreseeability.

*W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). Whether a particular wrongful act was the proximate cause of an injury is "one of fact particularly within the province of a jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances." *Tex. Dep't of Transp. v. Olson,* 980 S.W.2d 890, 893 (Tex.App.-Fort Worth 1998, no pet.) (quoting *Potter v. Anthony Crane Rental of Tex., Inc.,* 896 S.W.2d 845, 850 (Tex.App.-Beaumont 1995, writ denied)).

## Discussion

We begin our analysis with the court's charge and a review of the evidence. The complained-of damages awards were found by the jury in response to Questions 4 and 5 of the charge. Question 4 asked the jury to determine damages based on an evaluation of what would have happened if appellants' representations had been true.[3] Question 5 asked the jury to determine damages based on an evaluation of what would have happened if appellants' representations had never been made.[4] For both damages questions, the jury was instructed to consider only three categories of losses: change in value, capital investment, and operating cash flow. And they were instructed that the damages must be proximately caused by appellants' fraud or negligent misrepresentations.[5]

## Summary of the Evidence

The trial record shows the following. Defterios told Nussbaum in February 2004 about Flaven's interest in the properties. Nussbaum had already placed six of the properties on the market when Flaven signed the contracts and the other three would have been ready to market within the next few months. Properties like those involved in this case normally sell within nine to twelve months.

Defterios knew that the properties subject to Flaven's contracts needed capital improvements. Before the parties signed the contracts, Defterios negotiated, on Flaven's behalf, a $5 million allowance for deferred maintenance that would ultimate-

---

3. Question 4 in its entirety stated:
 What sum of money, if any, if paid now in cash, would fairly and reasonably compensate each of the Plaintiffs listed below for its damages, if any, that were proximately caused by such fraud?
 These amounts, if any, are intended to put each Plaintiff in the same financial position it would have been in if Defendants' representations had been true. Consider the following elements of damages, if any, and none other:
 1. Change in value after April 27, 2004;
 2. Capital investment after April 27, 2004; and
 3. Operating cash flow after April 27, 2004.

4. Question 5 in its entirety stated:
 What sum of money, if any, if paid now in cash, would fairly and reasonably compensate each of the Plaintiffs listed below for its damages, if any, that were proximately caused by such fraud or negligent misrepresentation?

 These amounts, if any, are intended to put each Plaintiff in the same financial position it would have been in if Defendants' representations had never been made. Consider the following elements of damages, if any, and none other:
 1. Change in value after April 27, 2004;
 2. Capital investment after April 27, 2004; and
 3. Operating cash flow after April 27, 2004.

5. The charge defined proximate cause:
 "Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

ly reduce the sales prices of the properties.[6] The parties signed the contracts on the properties in April 2004. The original closing date was August 2004, but it was extended numerous times. One of the first extensions of the closing date was to September 9, 2004. Before that date arrived, Flaven agreed to reduce the $5 million deferred maintenance allowance to $4 million in exchange for Nussbaum's agreement to extend the closing date. Nussbaum agreed to the extension because Defterios said "he had reverified the money was there and the funding was imminent." Nussbaum testified that if Defterios had not made those representations, he would not have agreed to extend the closing date and would have placed the properties back on the market on September 9. In January 2005, the deals still had not closed, and Nussbaum wrote Flaven a letter, with a copy to Defterios, stating, among other things, that he "would have cancelled the contracts months ago, but [he] was told by your agent, that Jim is a good guy and will close these deals."

By the time it became clear that Flaven would not purchase the properties, which was about a year after the contracts were signed, appellees had to invest capital to make repairs. Additionally, the rental property market had declined due to subprime lending that allowed first-time home buyers to qualify to purchase homes. Nussbaum and Defterios were both aware before they signed the contracts that subprime lending for home purchases was affecting the market for these types of properties.

## Cause-in-fact

Appellants contend that there is no or insufficient evidence that their misrepresentations were a cause-in-fact of appellees' damages. Cause-in-fact means that a defendant's act was a substantial factor in bringing about the injury which would not have occurred otherwise. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458–59 (Tex.1992). The defendant's act does not have to be the sole cause. *Id.* Cause-in-fact may be proved by direct or circumstantial evidence and inferences from the evidence. *Id.* at 459. The inquiry is whether reasonable minds could draw an inference that the defendant's wrongful conduct caused the plaintiff's damages. *See id.*

In this case, the inquiry is whether reasonable minds could draw an inference that appellants' misrepresentations were a substantial factor in causing appellees to incur capital investments, operating losses, and loss in value of the properties, and that appellees would not have incurred those injuries otherwise. *See id.* at 458–59. Appellants contend that the evidence does not support such a finding because capital investments, operating losses, and loss in value were already calculated into the market value of the properties generally and specifically in BNC's "normal business model." They argue that the evidence showed that BNC's "normal business model" was to purchase deteriorating properties, renovate them, rent them out,

---

**6.** Nussbaum explained what "deferred maintenance" means:

> [D]eferred maintenance means items on each property—physical items that could be repaired or should be repaired within a certain period of time. It has to do with like I mentioned before, like a roof, for example. A roof has a certain age and as you get towards the end of that age that

> roof is deteriorating rather rapidly and needs to get done or you're going to end up with everybody on the top floor with water coming in everytime [sic] it rains. Deferred maintenance items can be for minor things like replace landscape head—heads on—in the lawn, to major items like roofs or a parking lot or a swimming pool that has a crack in it, something like that.

and, at some point, sell them.[7] Appellants contend that BNC's business model "recognize[d] and accept[ed] the necessity for capital investment and the probability of short-term net operating losses as the price of ultimate long-term success." Consequently, they argue, appellees' damages "did not flow from the misrepresentations in a natural and continuous sequence" and their misrepresentations could not be a cause-in-fact of the damages awarded by the jury.

Appellees argue that the evidence shows that they would not have owned the properties for as long as they did if appellants had not made the misrepresentations. And they argue that because they owned the properties longer than they would have without appellants' misrepresentations, they suffered injury by having to expend capital for repairs and from the decline in the market, both of which resulted in operating losses.

■ Having reviewed the evidence and the parties' respective arguments, we conclude that the jury could have reasonably found that appellants' misrepresentations were a cause-in-fact of appellees' damages. The evidence showed that appellees did not cancel the contracts with Flaven because appellants continually represented that the trust funds had been verified and that Flaven was going to purchase the properties. The evidence showed that if Defterios had not represented that he had verified the existence of the trust funds and that the closings were imminent, Nussbaum would not have extended the closing date and would have put the properties back on the market on September 9, 2004. The evidence also showed that Nussbaum deferred maintenance on the properties because of the contracts with Flaven. By the time appellees realized that Flaven would not purchase the properties, the market had declined and the properties needed repairs. Nussbaum had to take the properties off the market and make the repairs before he could place the properties back on the market. Additionally, the evidence showed that the properties had to be taken off the market because they were "shop worn" and prospective buyers had lost interest in them. The jury could have reasonably found from the evidence that appellants' representations caused appellees to incur expenditures for capital improvements, operating losses, and a loss in market value that they would not otherwise have incurred if the properties had closed according to the contracts.

**Foreseeability**

■ Appellants also argue that they could not foresee that their misrepresentations could cause appellees to incur capital expenditures, operating losses, or decline in values of the properties. Foreseeability "requires that a person of ordinary intelligence should have anticipated

---

7. Nussbaum testified:

What we generally do is we buy, you know, blue-collar working type neighborhood properties that when we buy them usually have a fair amount of deferred maintenance, so we'll have to come up with a down payment to the seller, we'll come up with a new loan and then we'll have to put aside money for the rehab....

I mean, a lot of the properties we buy have a lot of vacancy when we buy them and we bring those units back online and rent them out.

[S]o we buy a property that needs fix-up, we do the fix-up, then we rent it and we maintain it. I mean, we have maintenance people and all that, that are doing all the work concurrent with the ownership, and eventually we reach what we consider to be the group decision that now it's time to sell and we vote and we sell.

the danger created by a negligent act or omission." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex.1985)). "The danger of injury is foreseeable if its 'general character ... might reasonably have been anticipated.' " *Id.* (quoting *Mr. Prop. Mgmt.*, 690 S.W.2d at 551). The inquiry is one of "common experience applied to human conduct." *Id.* (quoting *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex.1987)). And "[i]t asks whether the injury 'might reasonably have been contemplated' as a result of the defendant's conduct." *Id.* (quoting *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.1980)).

Appellants contend that the evidence shows that no one can foresee what a market will do long-term. They cite Nussbaum's testimony in which he acknowledged that "[m]arkets are cyclical; they go up and down always...." And they cite appellees' damages expert who testified that when a person purchases a multifamily apartment complex, he is taking the risk that the value might change over time, that he might have to put capital into the property to maintain and improve it, and that cash flow may or may not cover the expenses. Appellants argue that to hold them liable for all the damages from a downturn in the market, capital expenditures, and operating losses makes them an insurer of appellees' entire investment, contrary to *Arthur Andersen*, 945 S.W.2d at 817 (stating that "to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff's entire investment").

Appellees argue that the damages were foreseeable to appellants because appellants were aware of the particular circumstances involved here and the damages followed from appellants' fraud "in the ordinary course of events."

 Again, having reviewed the evidence and the parties' respective arguments, we conclude that the jury could have reasonably found that the types of damages incurred by appellees were foreseeable to appellants. The evidence showed that Defterios was a real estate broker and, as such, was familiar with the market. The jury could have reasonably inferred that a person in Defterios's position could have contemplated that the types of losses awarded here would be incurred if his representations were false. For example, it was reasonable for the jury to infer that appellants could have anticipated that if they misrepresented the buyer's ability to purchase the properties that the seller would incur capital expenditures to pay for the maintenance that was deferred when the buyer did not fulfill his contract to purchase the properties. *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 903 (Tex. 2011); *Doe*, 907 S.W.2d at 478. Similarly, appellants' representations that caused appellees to extend the closing date numerous times also, in turn, caused the properties to remain off the market for a longer period than normal. *See Basic Capital*, 348 S.W.3d at 903; *Doe*, 907 S.W.2d at 478. And because the evidence showed that appellants were aware that the market for the types of properties involved here was already being affected by subprime lending when the contracts were signed, the jury could have reasonably inferred that appellants could have anticipated that appellees would suffer a decline in market values of the properties if Flaven did not close on the stated closing date. The jury

also could have reasonably inferred that appellants could have anticipated that appellees would incur operating losses if appellees had to market the properties in a down market and make substantial repairs to the properties because Flaven did not close on the contracts.

In summary, we conclude that the evidence was legally and factually sufficient to support the jury's findings that the damages were proximately caused by appellants' misrepresentations.

**Claimed Loss of Capital Investment**

Appellants contend that even if the capital investments were proximately caused by their misrepresentations, appellees did not produce legally or factually sufficient evidence that those investments caused appellees to suffer a pecuniary loss. Appellees point out that the jury was not asked to make a separate award of damages based on capital investments, but, instead, was asked to consider capital investment as one of three elements in their determination of damages. And appellees argue that they presented "ample evidence that capital improvements were a proper element of the total damages awarded by the jury." We agree with appellees.

Appellees introduced testimony about their losses through their damages expert, David Neil Fuller. Fuller generally described what he meant by capital investment and how he arrived at the calculations for each plaintiff. He explained how he accounted for any increase or decrease in the value of a property caused by capital investments made after Flaven failed to close on the contracts. If the property increased in value, he accounted for that increase by offsetting the amount of the capital investment by the amount of the increase in value. In some cases, this calculation resulted in no loss at all to the plaintiff.[8] If the property decreased in value, he accounted for that decrease by including the amount of the capital investment in the total damages calculation. Appellees introduced charts summarizing Fuller's calculations and showing the amount of capital investment for each plaintiff.

■ Appellants do not challenge any of Fuller's calculations. And they concede that "lost capital investments may be recovered as consequential damages...." However, citing *Washington Mutual Bank v. Houston Windcrest West Road I, L.P.*, 262 S.W.3d 856 (Tex.App.-Dallas 2008, pet. denied), they contend that appellees had to do more than "account[ ] for [capital investments] in their expert's value calculations." But *Washington Mutual* does not apply here. The plaintiff there sought damages for the defendant's negligent misrepresentation in the form of repairs it had made on its property and payments to service the debt. *Id.* at 857–58. And the plaintiff did not offer any evidence specifically describing the repairs, the actual cost of the repairs, or the amount paid as debt service. *Id.* at 860–61. Here, however, there is evidence to support the actual cost of the capital investment for each property. And Fuller explained how he accounted for the capital investment in the property's overall value. We conclude that there is legally and factually sufficient evidence to support the jury's implied finding that the capital investments actually resulted in losses to appellees.

**Length of Time on the Market**

Appellants also argue that even if the damages awarded by the jury were proximately caused by their misrepresentations, appellees did not produce any evidence

---

8. The record shows that the jury was not asked to decide whether to award damages to

three of the plaintiffs because appellees did not contend that they suffered any losses.

that appellants' misrepresentations caused appellees' properties to remain on the market for longer than the normal marketing period for those types of properties. Appellants contend that the time period used for calculating the damages in this case was "too long as a matter of law." They argue that they should not be liable for any losses or changes in value incurred after April 2006 for several reasons.[9]

First, appellants argue that appellees intentionally took some of the properties off the market, which appellants contend is one reason the properties remained on the market past their normal marketing period. But the evidence showed that Nussbaum took some of the properties off the market because the properties had been under contract to Flaven for so long and "everybody that had expressed interest on them before knew they were under contract. . . ." The evidence showed that after properties have been on the market for a while without selling, they become "shop worn" and buyers "tend to shy away from them."

Next, appellants contend that they should not be liable for any losses incurred after April 5, 2006, because that is one year from the date that Nussbaum realized that Flaven would not fund the deals. They cite an email from Nussbaum dated April 5, 2005, in which he said he had "no belief at this point that [J]im will ever fund" the deals. Appellees testified that nine to twelve months was the normal marketing period for these types of properties, so appellants contend that twelve months from Nussbaum's email is the outside date for which they should be liable for any losses. But the evidence showed that Fuller chose the ending dates he did because after appellees realized Flaven

would not purchase the properties, they took "steps to get the properties sold even if they weren't on the market, they were refurbishing and preparing to sell the properties."

Next, appellants argue that they should not be liable for losses after April 5, 2006, because one reason the properties took longer to sell is that Nussbaum turned down offers "before the Flaven sale," and "did not entertain other offers" pending the sale to Flaven. Appellants contend that this suggests that Nussbaum "may have held out for unachievable prices as the market declined." But appellants do not explain how turning down offers *before* Flaven even signed the contracts affects appellees' damages. And Nussbaum explained that he could not have signed a contract with another buyer while the properties were under contract with Flaven because "nobody wants to give a back-up offer unless they've already done their due diligence." Nussbaum testified that generally a buyer will not place a back-up offer on a property already under contract.

■ Having reviewed the record, we conclude that the jury could have reasonably found that appellees could not sell the properties while they were under contract with Flaven; that after the contracts failed to close, prospective buyers were not expressing any interest in the properties because they knew the properties had been under contract; that the properties were "shop worn" and in need of repairs; and that the best solution was to take the properties off the market for a while. The jury could have reasonably found from the evidence that appellants' misrepresentations caused the properties to remain on the market longer than the usual market-

---

9. Fuller testified that he used different ending dates for the calculation of damages. The ending date for the properties that had not sold before trial was June 30, 2008. The ending date for the properties that sold prior to trial was the date of the sale.

ing period for those types of properties. Because the properties remained on the market longer than normal, the properties declined in value due to the downturn in the market and appellees incurred operating losses.

In summary, we conclude that appellees presented legally and factually sufficient evidence that the consequential damages in this case were proximately caused by appellants' misrepresentations. *See Shell Oil Prods. Co. v. Main St. Ventures, L.L.C.,* 90 S.W.3d 375, 385–86 (Tex.App.-Dallas 2002, pet. dism'd). We further conclude that the evidence is legally and factually sufficient to support the damages amounts awarded by the jury. We resolve issue one against appellants.

## Types of Consequential Damages Awarded

In issue two, appellants contend that the damages awarded by the jury in response to Question 4 "cannot stand" because they are based on a benefit-of-the-bargain theory and (1) there is no such thing as "benefit-of-the-bargain consequential damages," (2) benefit-of-the-bargain damages are not recoverable for common-law fraud, (3) benefit-of-the-bargain damages are not recoverable except for fraudulent inducement of contract, and (4) benefit-of-the-bargain

damages are not recoverable for negligent misrepresentation.

Initially, we note that Question 4 relates to the jury's finding that appellants committed fraud. It does not relate to the jury's finding that appellants made negligent misrepresentations. And the claim for fraudulent inducement was not submitted to the jury. Consequently, we address only the first two subparts of issue two.[10]

Appellants essentially contend that the damages found by the jury in response to Question 4 will not support the judgment because Question 4 is based on a remedy that does not exist in Texas law—"benefit-of-the-bargain consequential damages." They contend that "benefit-of-the-bargain consequential damages" are not recoverable against them because they were not parties to the contract and did not make the bargain with appellees. Appellants argue that "James Flaven's inability to close on his contracts was not caused in fact by Defterios's statements that Flaven had such ability, and thus damages resulting from Flaven's inability to close do not qualify as consequential damages in this case." They also argue "[a]ny damages that flow from the falsity of the representations, therefore, as opposed to the making of the representations, were not proximately caused by [Defterios]."[11]

10. Appellants contend that *Formosa Plastics,* which stated that "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure," 960 S.W.2d at 49, was wrongly decided and that we should limit its application here. They contend that the supreme court "confused the measure of damages for common-law fraud with damages measures that were developed for use in Deceptive Trade Practices Act cases...." Although appellants concede that we do not have authority to overrule *Formosa Plastics,* they ask us to "recognize that there is a distinction in the measure of damages between ordinary common-law fraud and

fraudulent inducement cases—and decline to apply the benefit-of-the-bargain measure of damages here because there was no contract between" appellants and appellees. *Formosa Plastics* was a fraudulent inducement case. *See Formosa Plastics,* 960 S.W.2d at 49–50. It did not involve a claim for consequential damages. *See id.* at 49 n. 1. Consequently, *Formosa Plastics* does not control our analysis.

11. To the extent this issue challenges the sufficiency of the evidence to support the jury's proximate cause finding, we previously addressed that argument.

Appellees contend that Question 4 is correct. They argue that consequential damages are "informed by the same perspective that underlies direct benefit of the bargain damages" recognized by Texas law. For example, they argue that lost profits are recoverable as consequential damages. *See Trenholm,* 646 S.W.2d at 933 (upholding award of lost profits as consequential damages in fraud case). And they argue that Texas case law supports the conclusion that Question 4 appropriately instructed the jury concerning the measure of damages in this case. Appellees also contend that appellants' complaint is really one of charge error and that appellants did not object to Question 4 on this basis. Appellants respond that they are not complaining of charge error. Instead, they argue that they "primarily challenge the *judgment* for benefit-of-the-bargain damages; they challenge the *jury question* regarding such damages only to the extent of saying that it is immaterial and will not support the judgment." They cite *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91 (Tex.1999), and *Wal–Mart Stores, Inc. v. McKenzie,* 997 S.W.2d 278 (Tex.1999) to support their argument.

In *Holland,* Walmart sought to reverse an award for attorney's fees because it contended that the recovery of attorney's fees was not authorized by statute. *Holland,* 1 S.W.3d at 94. Holland contended that Walmart did not preserve the issue for review because it did not object to the submission of the attorney's fees question to the jury. *Id.* The supreme court held that Walmart preserved error because the question of whether attorney's fees were recoverable under the statute was a question of law for the court. *Id.* Consequently, the court said that the amount of attorney's fees that the jury found was immaterial to the ultimate legal issue of whether the attorney's fees were or were not recoverable as a matter of law. *Id.*

The court distinguished the situation in which a party argues that a remedy is not permitted by law from the situation "in which the trial court had to resolve a legal issue before the jury could properly perform its fact-finding role." *Id.* It stated that, in the latter situation, "a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial." *Id.*

Similarly, in *McKenzie,* Walmart argued for the first time on appeal that the award of mental anguish and other damages was not authorized by statute. *McKenzie,* 997 S.W.2d at 279–80. McKenzie contended that Walmart did not preserve the issue for review because it did not object to the court's charge that submitted the damages questions to the jury. *Id.* at 280. The supreme court disagreed because "[w]hether a particular remedy is available under a statute is a question of law for the court." *Id.* It remanded the case to the court of appeals to consider the merits of Walmart's issue. *Id.* at 281.

Unlike in *Holland* and *McKenzie* where the issue was whether the remedies were authorized by law, here, it is undisputed that the law authorizes the recovery of consequential damages in a fraud claim. *See Formosa Plastics,* 960 S.W.2d at 49 n. 1 (recognizing that, in the appropriate case, "consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable") (citing *Arthur Andersen,* 945 S.W.2d at 817); *Trenholm,* 646 S.W.2d at 933 (upholding award of lost profits as consequential damages in fraud case). And the authorities that appellants cite do not support their argument that the types of consequential damages awarded by the jury in this case are not recoverable as a matter of law.

■ We now turn to appellants' argument that the damages awarded in this case are "benefit-of-the-bargain consequential damages." In contrast to direct damages, which compensate a party for loss that necessarily resulted from the defendant's wrongful conduct, consequential damages compensate a party for loss that resulted naturally, but not necessarily, from the defendant's wrongful conduct. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex.2007). Benefit-of-the-bargain damages, which "derive from an expectancy theory," compensate a party for the loss of a benefit the party expected to receive as a result of the agreement. *See id.* at 636–37. But consequential damages do not compensate a party for benefits the party expected to receive; they compensate a party for damages incurred as a proximate cause of the defendant's wrongful conduct. *See id.*

Question 4 asked the jury to consider damages that appellees suffered, if any, as a consequence of appellants' fraud.[12] Although the question included an instruction that the damages "if any, are intended to put each Plaintiff in the same financial position it would have been in if Defendants' representations had been true," it did not instruct the jury to consider what appellees *expected* to receive if the representations had been true. That question was asked in Question 3.[13] Instead, Question 4 instructed the jury to consider three specific elements of damages, and no others—change in value, capital investment, and operating cash flow—proximately caused by appellants' fraud. And it instructed the jury to consider those ele-

ments of damages that were incurred *after* the contract date. We conclude that those damages are consequential damages, not benefit-of-the-bargain damages. *See id.* at 636–37; *Formosa Plastics*, 960 S.W.2d at 49 n. 1; *Arthur Andersen*, 945 S.W.2d at 816; *Trenholm*, 646 S.W.2d at 933.

We resolve issue two against appellants.

## DAMAGES AWARDED TO BNC REGENCY WALK, L.P. AND BN REGENCY, L.L.C.

In issue three, appellants argue that the judgment awarding $4 million in damages jointly and severally to BNC Regency Walk, L.P. and BN Regency, L.L.C. must be reversed because there is no evidence of those parties' respective ownership share of the property and, consequently, no evidence of their proportionate share of the damages. Appellees contend that we must affirm the judgment because appellants have not shown how they were harmed by the judgment.

Appellants appear to contend that the jury awarded damages for a specific property jointly owned by BNC Regency Walk, L.P. and BN Regency, L.L.C. and that because there is no evidence of their proportionate share of ownership, there is also no evidence to support the damages award. But the evidence showed that the damages were calculated for each plaintiff, not for each property. In addition, the jury assessed damages by plaintiff, not by property. As we explained before, appellees' expert testified about how he arrived at the damages calculations, and appellees

---

12. *See supra* n. 3.

13. Question 3 asked the jury "[w]hat sum of money, if any, if paid now in cash would fairly and reasonably compensate each of the Plaintiffs listed below for its damages, if any, that resulted from such fraud?" It instructed the jury to consider "[t]he difference, if any, between the value a Plaintiff would have received if Defendants' representations had been true and the value it actually had after being subject to those representations." And it instructed the jury to consider the difference in value, if any, as of the contract date.

introduced summaries of Fuller's calculations showing the damages by plaintiff. The summary showed that Fuller calculated BNC Regency Walk, L.P.'s damages at over $4 million. The jury awarded BNC Regency Walk, L.P. $4 million in damages. We previously found that there was legally and factually sufficient evidence to support the award of damages.

■ However, the trial court awarded the $4 million in damages jointly and severally to BNC Regency Walk, L.P. and BN Regency, L.L.C., presumably because the two parties were co-owners of one of the properties. But appellees did not offer any evidence that BN Regency, L.L.C. incurred any damages. Appellees' expert did not testify that BN Regency, L.L.C. incurred damages as a result of appellants' conduct, the exhibit summarizing the expert's testimony does not include BN Regency, L.L.C., and appellees did not submit a damages question for BN Regency, L.L.C. And we cannot deem a finding of damages on behalf of BN Regency, L.L.C. because appellants objected to the jury charge on this basis.[14] *See* TEX.R. CIV. P. 279 (stating when element of recovery is omitted, without request or objection, court will deem a finding on the element to support the judgment).

■ In the hearing on appellees' motion for entry of judgment and now on appeal, appellees contend that appellants cannot complain about the judgment because both BNC Regency Walk, L.P. and BN Regency, L.L.C. were plaintiffs, the jury found in favor of the plaintiffs, and the judgment is res judicata as to both entities. They contended below and now that when multiple plaintiffs sue, they can

recover a single collective award of damages. But the cases that appellees cite do not support their argument that a party for whom no damages question was submitted may nevertheless recover damages awarded to a different party. *See Manges v. Guerra,* 673 S.W.2d 180, 184 (Tex.1984) (no indication that all plaintiffs were not submitted in the jury charge); *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.,* 202 S.W.3d 250, 268–69 (Tex.App.-Corpus Christi 2006, pet. denied) (two plaintiffs were submitted together because they did not incur separate damages); *Garvin v. Goldsmith,* 406 S.W.2d 545, 547–48 (Tex.Civ.App.-Waco 1966, writ ref'd n.r.e.) (involving one plaintiff and multiple intervenors); *Anzaldua v. Richardson,* 287 S.W.2d 299, 301 (Tex.Civ.App.-San Antonio 1956, writ ref'd n.r.e.) (issue was whether ownership of property by adverse possession could be joint). And they cite no authority by which a trial court may award damages to a party for which there is no evidence of damages and over the defendants' objections. A trial court has no authority to substitute its judgment for that of the jury. *See Washington Mut.,* 262 S.W.3d at 862.

We resolve issue three in part in appellants' favor, and we reform the judgment by deleting all references to a joint and several recovery by BN Regency, L.L.C. on pages 7 and 8 of the final judgment. *See* TEX.R.APP. P. 43.2(b). The judgment is modified as follows:

It is further ORDERED, ADJUDGED AND DECREED that Plaintiff BNC Regency Walk, L.P., based on the jury's answers to Question Nos. 1 and 4, recover from Defendants, Steven

---

14. Appellants objected to the submission of Question 4 with regard to BNC Regency Walk, L.P. "for the reason that the undisputed testimony was that the Plaintiffs owned this—owned a property in common jointly with BNC Regency, L.L.C., [sic] and that the jury cannot determine what would be the ownership interest of BNC for which it could then conclude how—to what extent BNC Regency Walk, L.P. suffered any damage."

Defterios and Henry S. Miller Commercial Co., jointly and severally, judgment in the amount of $4,000,000, plus pre-judgment interest thereon in the amount of $385,754.45.

CONCLUSION

We affirm the trial court's judgment as modified.