# Supreme Court of Texas

No. 22-1143

Henry S. Miller Commercial Company,

*Petitioner–Cross-Respondent,*

v.

Newsom, Terry & Newsom, LLP and Steven K. Terry,

*Respondents–Cross-Petitioners*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued October 3, 2024**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which Justice Boyd, Justice Devine, Justice Blacklock, Justice Busby, Justice Huddle, and Justice Young joined, and in which Justice Bland joined except as to Part III(A).

JUSTICE YOUNG filed a concurring opinion, in which Justice Bland joined.

JUSTICE BLAND filed an opinion concurring in part and dissenting in part.

Justice Lehrmann did not participate in the decision.

Client blames its Lawyer for losing its case. Its Opponent's position throughout trial had been that Client had the weaker case. Afterward, Client assigns its malpractice claim against Lawyer to Opponent in hopes of sharing in a recovery against him for the financial benefit of both. But to win as plaintiff in the legal malpractice case, Opponent must do an about-face from its position in the underlying litigation: from "I won because I had the stronger case," to "I wouldn't have won but for Lawyer's negligence." We have called that blatant reversal driven solely by financial interest "demeaning" to the justice system, and it is one reason among several why we have long held that, as a general rule, "one cannot assign a cause of action for legal malpractice."[1]

But even if Client does not assign its legal malpractice claim and sues for itself, as we will show happened here, Opponent, as Client's judgment creditor from the underlying case, may yet seek some control or influence over the malpractice claim to benefit from Client's recovery against Lawyer, and change positions to achieve that objective just as it would if the malpractice claim were its own by assignment. The principal issue in this case is whether taking opposite positions in related litigation to win a legal malpractice claim—whether that change of position alone, disturbing as it is—bars prosecution of the claim, just as an assignment would. We agree with the court of appeals that it does

---

[1] *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 315, 318 (Tex. App.—San Antonio 1994, writ ref'd); *see also State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 707-708 (Tex. 1996); *see also Mallios v. Baker*, 11 S.W.3d 157, 159, 162-172 (Tex. 2000) (Hecht, J., concurring).

not.[2] The Client's claim is its own so long as it retains substantial control over it, whatever interest in Client's success another may have.[3] To be sure, the trial court must be careful to see that a jury is fully aware of Opponent's efforts and incentives to advance Client's position against its Lawyer and not be confused or misled by Opponent's change of position and financial interest in the outcome.

On an entirely separate matter, we hold, contrary to the court of appeals,[4] that while there is evidence Lawyer's negligence caused Client some damages, there is no evidence that it caused the entire amount of damages found by the jury, or that Lawyer was grossly negligent in representing Client, and therefore the case must be remanded for yet a third trial.[5] We need not, and do not, address the court of appeals' judgment remanding to the trial court due to an improper jury charge

---

[2] 684 S.W.3d 502, 511 (Tex. App.—Dallas 2022); *Henry S. Miller Com. Co. v. Newsom, Terry & Newsom, L.L.P.*, No. 05-14-01188-CV, 2016 WL 4821684, at *3 (Tex. App.—Dallas Sept. 14, 2016, pet. denied).

[3] *See Mallios*, 11 S.W.3d at 170 (Hecht, J., concurring) ("[A]n assignment of an interest in a legal malpractice claim is contrary to public policy if the assignee takes the interest purely as an investment unrelated to any other transaction and acquires not merely a financial interest in the outcome but a significant right of control over the prosecution of the claim").

[4] 684 S.W.3d at 514.

[5] *See Guevara v. Ferrer*, 247 S.W.3d 662, 669-670 (Tex. 2007) (holding that where there was evidence that some of the plaintiff's medical expenses resulted from a car wreck but no evidence that all did, remand for a new trial was appropriate); *see also Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682 (Tex. 2000) (holding that where there was evidence of some fraud damages, but there was no evidence to support the full amount of damages found by the jury, remand for a new trial was appropriate).

3

commenting on the weight of the evidence.[6]

## I

The events underlying this case span 20 years and are set out in the court of appeals opinion before us and in two prior opinions, which we refer to, earlier to more recent, as *HSM I*,[7] *HSM II*,[8] and *HSM III*.[9] With those opinions as resources to the reader, we confine our discussion of the background, though still lengthy, to those facts important to our analysis of the legal issues we decide.

## A

In early 2004, Barry Nussbaum's real estate broker received an unsolicited call from Steven Defterios, a real estate sales agent, saying that his client, James A. Flaven, had a $300 million trust fund from which he wanted to spend $100 million to purchase Texas properties in Nussbaum's portfolio. Nussbaum bought, renovated, and sold commercial apartment complexes and office buildings on behalf of individual investors.[10] Defterios had begun working with broker Henry S. Miller Commercial Co. (HSM) the year before as an independent contractor, but HSM allowed him use of the title "vice president" even though he was not an officer or employee of the company. Defterios said he knew Flaven quite well, that he had worked with Flaven on other

---

[6] 684 S.W.3d at 516.

[7] *Defterios v. Dall. Bayou Bend, Ltd.*, 350 S.W.3d 659 (Tex. App.—Dallas 2011, pet. denied).

[8] *Henry S. Miller Com. Co.*, 2016 WL 4821684.

[9] 684 S.W.3d 502.

[10] References to Nussbaum include his various entities.

4

deals, and that Flaven's financial worth had been verified. None of that was true. Nussbaum was interested in the investment prospect because of Defterios' position with HSM, although Nussbaum's broker also met with Flaven himself and decided he was a legitimate investor. Nussbaum contracted to sell nine properties to Flaven for some $90 million.[11] But Flaven immediately reported difficulties in obtaining funds from his trust, and closing was delayed repeatedly. Flaven and Defterios made excuses and reassurances, telling Nussbaum that funding from Flaven's trust was imminent. But by May 2005, the sale had collapsed. As it turned out, Flaven was a Massachusetts truck driver with no significant assets.

Nussbaum sued HSM and Defterios for fraud and misrepresentations resulting in his losses from the decline in his properties' value while they were under contract and off the market. HSM denied ever having been involved in the transaction or knowing anything about Flaven. Both sides worried about whether to join Flaven in the suit. Nussbaum's attorney, Marc Stanley, was concerned that if they did, HSM would argue that it was as much a victim of Flaven's fraud as Nussbaum, and the jury would pin all the blame on Flaven, the "bad guy", who was insolvent, giving Nussbaum a Pyrrhic victory, an uncollectable judgment. So Nussbaum never sued Flaven, and Stanley argued to the jury that HSM alone was responsible for the fraud. HSM's attorney, Steven Terry, knew from the outset that designating Flaven a

---

[11] The actual buyer was Orleans Properties, LP, an entity created by Flaven.

responsible third party could reduce HSM's percentage of any liability,[12] but he worried that when Flaven was proven to be an obvious con man, the jury would believe that HSM and Defterios, experienced brokers, clearly either knew or should have known, and be more inclined to hold them entirely responsible for the fraud. Terry remained undecided until a few days before trial, when he finally moved to designate Flaven as a responsible third party, asserting that Flaven alone was liable to Nussbaum. Nussbaum opposed the motion because it was untimely[13] and stated no legal duty that Flaven breached. The trial court denied the motion without explanation.

Another issue at trial was whether Defterios acted with HSM's authority even though it disavowed any knowledge of the transaction.[14] Terry believed HSM was liable by statute,[15] that the evidence showed Defterios was its authorized agent, and that for HSM to deny responsibility would indicate its dishonesty in allowing Defterios to use the title of vice president. In addition, HSM's president testified that he was "proud" of how Defterios had handled the transaction, although he equivocated after hearing Defterios admit on the stand that he had lied

---

[12] *See* TEX. CIV. PRAC. & REM. CODE § 33.003(a).

[13] *See id.* § 33.004(a) (stating that a motion to designate a responsible third party "must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date").

[14] *See HSM II*, 2016 WL 4821684, at *4-*5.

[15] *See* Act of June 1, 2003, 77th Leg., R.S., ch. 1421, 2003 Tex. Gen. Laws 4688 (amended 2016) (current version at TEX. OCC. CODE § 1101.803) ("A licensed broker is liable to the commission, the public, and the broker's clients for any conduct engaged in under this chapter by the broker or by a salesperson associated with or acting for the broker.").

about Flaven. During the litigation, Defterios left his association with HSM. Thinking it would be better to minimize any apparent conflict between HSM and Defterios before the jury, and believing that HSM was statutorily responsible for all Defterios' actions anyway, Terry stipulated, after the evidence closed, that Defterios had always acted with HSM's authority, notwithstanding its complete lack of involvement in the Nussbaum transaction.

The jury found HSM and Defterios liable for fraud and negligent misrepresentations. In December 2008, the trial court rendered judgment for Nussbaum for $8.1 million plus pre- and post-judgment interest. HSM and Defterios appealed the damages award only, not the liability findings. The court of appeals affirmed in *HSM I*.

**B**

In February 2009, two months after judgment was rendered and a month after the appeal was filed, HSM sued its errors and omissions insurer, Diamond State Insurance Co., for denying coverage of the judgment, and Terry, its lawyer, for malpractice.[16] Five months into the suit, Nussbaum filed an involuntary petition in bankruptcy against HSM as a judgment creditor. In July 2010, the parties agreed on a plan of reorganization for HSM, which provided that HSM, "in its sole discretion, may prosecute, settle, or dismiss" its malpractice and insurance claims, and "all proceeds therefrom shall be [its] property". But the plan also provided that the first $5 million in recovery would go to Nussbaum, payable to Stanley as his agent, and that HSM could not

---

[16] HSM also sued Terry's firm, Newsom, Terry & Newsom, LLP. In discussing the parties' positions, we include the firm when referring to Terry.

7

settle for less than $5 million without their consent. HSM had "sole discretion to settle" for an amount over $5 million, and Nussbaum and Stanley would receive 70% of up to $13 million and 30% above that. The plan required Nussbaum to support HSM "toward . . . recovery" in the case, "recognizing that higher recoveries will enhance and benefit" the bankruptcy estate.

As part of the plan, Nussbaum consented to a temporary injunction prohibiting enforcement of his judgment against HSM as long as HSM used its "best efforts and all reasonable means" to pursue its claims against Diamond State and Terry. The temporary injunction is to become permanent only when that litigation is concluded and HSM has complied with its obligation. Its discharge from bankruptcy is deferred until then.

The bankruptcy court approved the plan while observing that it seemed to have no purpose but to assure Nussbaum that HSM would pursue its claims against its lawyer and insurer. The plan provisions regarding HSM's action against Diamond State and Terry were reiterated in a litigation agreement between Nussbaum and HSM.

Diamond State settled with HSM before trial for $6 million, so Nussbaum and Stanley's consent to settle for less than $5 million was never triggered.

## C

The legal malpractice case was tried in April 2014. HSM claimed that Terry was negligent and grossly negligent in handling the fraud case by not timely moving to designate Flaven as a responsible third

party and by stipulating that HSM had authorized Defterios' actions.[17] Opponents in the fraud case, Nussbaum and HSM, aligned against Terry. Stanley and another lawyer, Lewis Sifford, testified that if Terry had designated Flaven as a responsible third party, the jury would have allocated 85-100% of the responsibility for Nussbaum's damages to him, even though Stanley had argued for Nussbaum in the fraud case that HSM alone was responsible for all his damages. Sifford also testified that by stipulating Defterios acted with HSM's authority, Terry subjected HSM to complete liability when it otherwise would have had none.

The trial court directed a verdict for Terry on gross negligence. The jury found that but for Terry's negligence, the judgment in the fraud case would have been about $4.6 million less.[18] Crediting Diamond State's $6 million settlement left HSM with no net recovery.

Both sides appealed. The court of appeals held that HSM's plan of reorganization in the bankruptcy court, which Nussbaum prompted

---

[17] HSM also asserted that Terry failed to advise it of a potential conflict with Defterios, and separately, that he provided a substandard defense in several respects. *HSM II*, 2016 WL 4821684 at *4. HSM does not argue here that these were grounds for finding Terry negligent.

[18] The fraud judgment awarded Nussbaum $8,136,088 in damages found by the jury plus $782,631.99 in prejudgment interest. Subtracting from those damages the $4,636,088 the malpractice jury found to have been caused by Terry's negligence would leave exactly $3.5 million, disregarding interest. It is not clear why the malpractice jury settled on that number. One might conclude that the jury found Terry to have been about 57% responsible for the fraud judgment ($4,636,088 \div 8,136,088 = 0.5698$). But the jury also found that the fraud judgment was caused by HSM's, Defterios', and Terry's negligence and allocated responsibility 50% to Terry, 40% to Defterios, and 10% to HSM. These confusing findings do not appear to have been resolved.

9

and to which it agreed, was not an illegal assignment of its legal malpractice claim barring prosecution of it. The court noted that this Court has "'disapproved voluntary assignments of legal malpractice claims that necessitate a duplicitous change in the positions taken by the parties in antecedent litigation,' that is, where a party adopts a former adversary's position to pursue a claim for legal malpractice against the former adversary's lawyer."[19] But the court held that HSM was not barred from "assert[ing] its own malpractice claim . . . in its own name."[20]

The court of appeals held that there was evidence of Terry's negligence. As for gross negligence, the court of appeals reversed the directed verdict for Terry in part. Terry reasonably believed, the court concluded, that HSM's liability for Defterios' actions was required by statute so stipulating as much did not put HSM at any further risk. "[N]o reasonable factfinder", the court concluded, "could form a firm belief or conviction that in making decisions based on [his] interpretation of the statute, [Terry] had 'actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference' to HSM's rights."[21]

But the court concluded that there was evidence Terry was grossly negligent in failing to designate Flaven as a responsible third

---

[19] *HSM II*, 2016 WL 4821684, at *3 (quoting *Mallios*, 11 S.W.3d at 164 (Hecht, J., concurring)).

[20] *Id.*

[21] *Id.* at *5 (last alteration in original) (quoting TEX. CIV. PRAC. & REM. CODE § 41.001(11)(B)).

party. Flaven's many, repeated false statements were undisputedly a cause of Nussbaum's claimed injury, and assigning liability to him would reduce any assigned to HSM. Terry explained that he could not meet the deadline for designating Flaven as a responsible third party because he could not find him to talk with him, and he was concerned that asserting Flaven's responsibility would reflect poorly on Defterios, HSM's agent. The court rejected Terry's explanation: "[HSM] could have maintained there was no fraud in the underlying transaction, but pleaded in the alternative that if there was fraud, it was only on Flaven's part, not HSM's."[22] In the end, Terry moved to designate Flaven as a responsible third party, asserting that he alone was responsible for Nussbaum's damages, but after the deadline. The court concluded that Terry's admittedly intentional decision to delay in filing the motion that could avoid a potentially extreme risk to his client was some evidence of conscious indifference.[23]

### D

The second trial of the malpractice case, in November 2019, was much like the first with an important difference. As in the first trial, Terry explained that he was hesitant to designate Flaven a responsible third party because he was concerned that in doing so, he would be lending credence to Nussbaum's claim of injury. The legitimacy of his concerns and whether his delay misunderstood the law, and was therefore negligent, were again hotly contested issues and the subject of

---

[22] *Id.* at *6.

[23] *Id.*

extensive evidence on both sides. The court included in its jury charge the text of the statute governing the designation of responsible third parties.[24] But the court then added this additional instruction:

> In resisting a motion to strike a designation of a responsible third party, the Terry Defendants would not have been required to prove the plaintiffs' case that there was fraud in the underlying transaction. They could rely on evidence of the proposed transaction, its failure, and the identity of a responsible third party as the defaulting buyer in resisting a motion to strike a designation of a responsible third party.

Terry objected that the court was essentially instructing the jury that he made the wrong decision and was therefore negligent. Terry argued the court had gone beyond providing the jurors the text of the designation statute to read for themselves and was improperly commenting on the weight of that evidence.

The jury found Terry negligent and grossly negligent. As in the first trial, Stanley and Sifford again testified that if the jury had been asked to apportion responsibility for Nussbaum's injury between HSM and Flaven, it would have assigned 85-100% to Flaven. And Sifford again testified that by stipulating to HSM's responsibility for Defterios' actions, HSM was subjected to liability when it would not have been otherwise. HSM did not argue that the stipulation was grossly negligent, only that the failure to designate Flaven was. The jury found that the difference between the amount of the judgment rendered in the fraud case and the amount of the judgment that would have been rendered had Terry not been negligent was about $13.6 million, the total

---

[24] *See* TEX. CIV. PRAC. & REM. CODE § 33.004.

then due with interest. In effect, the jury found Terry 100% responsible for the fraud judgment against HSM.[25] The jury awarded punitive damages of $6 million against Terry and $1 million against his firm.

Terry appealed. The court of appeals refused to reconsider its holding in the first appeal that the bankruptcy reorganization plan and the relationship between HSM and Nussbaum made prosecution of the malpractice claim unlawful.[26] The court concluded that the evidence was sufficient to support the jury's finding that the rendition of judgment in the fraud case was caused by Terry's negligence and that not designating Flaven as a responsible third party was grossly negligent.[27] But a majority of the court concluded that the jury charge instruction on designating a responsible third party, to which Terry objected, was an improper comment on the weight of the evidence.[28] Accordingly, the court reversed and remanded for yet a third trial.[29]

**E**

Both Terry and HSM petition for review. We first consider whether HSM is prohibited from prosecuting its legal malpractice claim because its bankruptcy reorganization plan constitutes an assignment of the claim to Nussbaum and Stanley that is illegal under Texas law.

---

[25] The trial court refused to ask the jury whether HSM's and Defterios' negligence caused the judgment or to separately apportion responsibility for any excess judgment as it had in the first malpractice trial.

[26] *HSM III*, 684 S.W.3d at 511.

[27] *Id.* at 514.

[28] *Id.* at 516.

[29] *Id.*

13

We then turn to whether there is evidence that the fraud judgment was entirely caused by Terry's negligence and gross negligence.

## II

We first address whether the relationship between HSM and Nussbaum precludes HSM from asserting its legal malpractice claim against Terry.

## A

As we have recounted in other cases, the early common law did not allow alienation of choses in action in order to avoid multiplying litigation and because it regarded rights as personal.[30] The expectations and demands of a far more mercantile society have displaced the rule but have not eliminated the common law's concerns. "Practicalities of the modern world have made free alienation of choses in action the general rule, but they have not entirely dispelled the common law's reservations to alienability, or displaced the role of equity or policy in shaping the rule. Even today, the general rule is that a contractual assignment may be 'inoperative on grounds of public policy.'"[31]

We cited three such grounds in barring assignments of legal malpractice actions in *Zuniga v. Groce, Locke & Hebdon*.[32] One was that "assignability would make possible the commercial marketing of legal malpractice causes of action by strangers, which would demean the legal

---

[30] *See Gandy*, 925 S.W.2d at 705-706; *see also Mallios*, 11 S.W.3d at 162 (Hecht, J., concurring).

[31] *Gandy*, 925 S.W.2d at 707 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(b) (AM. L. INST. 1981)).

[32] 878 S.W.2d at 316-317.

14

profession."[33] Another was that the possibility of assignment could "drive a wedge between [an] attorney and his client [making it] increasingly risky to represent [an] underinsured, judgment-proof [client]" whose opponent would have a financial incentive to join with the client in suing the lawyer to obtain some recovery.[34] More generally, of continuing concern to the justice system, "[i]n each assigned malpractice case, there would be a demeaning reversal of roles. The two litigants would have to take positions diametrically opposed to their positions during the underlying litigation".[35] The plaintiff/assignee would have to argue that he prevailed in the underlying case not because he had the stronger position, as he had there asserted, but only because of the lawyer's negligent representation of his client. And the lawyer would argue that his client lost only because he had the weaker position, contrary to his advocacy on the client's behalf.[36]

> For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth. It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law

---

[33] *Id.* at 316.

[34] *Id.* at 317.

[35] *Id.* at 318.

[36] *Id.*; *see also Gandy*, 925 S.W.2d at 708; *Mallios*, 11 S.W.3d at 163 (Hecht, J., concurring).

of proximate cause have given them a financial interest in switching.[37]

Added to this negative reflection on the legal profession and the judicial process is the real risk of confusion to jurors hearing parties taking positions contrary to their pre-litigation interests.[38]

Manuel Zuniga fell from a ladder and sued its manufacturer, Bauer, whose insurer became insolvent. In hopes of yet achieving some recovery, the Zuniga family agreed to settle with Bauer by taking an assignment of its malpractice claim against its lawyer, Sprague, and allowing it to transfer all its assets to a new entity beyond the Zunigas' reach. The Zunigas then sued Sprague.[39] We affirmed the trial court's dismissal of the suit: "On balance, we conclude that the costs to the legal system of assignment outweigh its benefits. We hold that an assignment of a legal malpractice action arising from litigation is invalid."[40]

The assignee of a claim owns it, controls its prosecution, and is entitled to any recovery. But someone with less than ownership of a claim may still exert control over its prosecution and have a legal interest in recovery. In *Mallios v. Baker*, Baker sustained serious injuries when he wrecked his motorcycle after leaving a bar at 2:00 a.m. He retained Mallios to sue the owner of the bar under the Dram Shop

---

[37] *Zuniga*, 878 S.W.2d at 318 (citation omitted); *Gandy*, 925 S.W.2d at 708.

[38] *See Mallios*, 11 S.W.3d at 169 (Hecht, J., concurring).

[39] *Zuniga*, 878 S.W.2d at 314.

[40] *Id.* at 318.

16

Act.[41] Mallios sued and obtained a default judgment for more than $1 million, but it turned out the defendant did not own the bar, and when that was discovered, limitations on Baker's claim had run. Baker saw Herron's newspaper advertisement offering to buy judgments and contacted him for assistance in suing Mallios for legal malpractice. The two signed an agreement that Herron would employ counsel to sue Mallios, subject to Baker's consent, and would pay all attorney fees and expenses. Herron would receive half of any recovery plus reimbursement of expenses. Baker would fully prosecute the claim and could not settle without Herron's consent.[42] Herron simply invested in Baker's claim.[43] This Court held unanimously that regardless of whether the arrangement was something like an assignment, it did not preclude Baker from asserting his own legal malpractice claim in his own name.[44]

Four Justices concurring in the result would have held Baker and Herron's agreement to be invalid.[45] "[O]ur disapproval of the assignment in [*Zuniga*]," they wrote, "did not bar all transfers of legal malpractice claims":

> [T]his Court has disapproved voluntary assignments of legal malpractice claims that necessitate a duplicitous change in the positions taken by the parties in antecedent litigation, and we have expressed reservation about any commercial marketing of legal malpractice claims, but we have not precluded the transfer of such claims to the

---

[41] *See* TEX. ALCO. BEV. CODE § 2.02(b).

[42] *See Mallios*, 11 S.W.3d at 161 (Hecht, J., concurring).

[43] *Id.* at 170 (Hecht, J., concurring).

[44] *Id.* at 159.

[45] *Id.* at 163 (Hecht, J., concurring).

17

> client's surrogate, such as a bankruptcy trustee, and we have allowed equitable subrogation in certain circumstances.[46]

The concurring Justices would have held that "an assignment of an interest in a legal malpractice claim is contrary to public policy if the assignee takes the interest purely as an investment unrelated to any other transaction and acquires not merely a financial interest in the outcome but a significant right of control over the prosecution of the claim."[47] Because Baker had agreed to fully cooperate with Herron in the prosecution of his claim against Mallios and not to settle it without Herron's consent, and because Herron was Baker's counsel's sole source of payment of his attorney fees, the concurring Justices would have held that Baker's arrangement with Herron was an invalid assignment.[48] The "vice" in the arrangement, they said, was "not in a mere assignment of part of plaintiff's recovery, but in an assignment coupled with such control that the third party assignee has a commercial investment in the outcome and the power to protect it."[49] Nevertheless, the concurring Justices concluded: "It would be unfair to punish Baker for executing the assignment by depriving him of his claim against Mallios".[50] In other words, Baker could prosecute his claim against Mallios even though neither Baker nor Herron could enforce their agreement. Thus,

---

[46] *Id.* at 164 (Hecht, J., concurring).

[47] *Id.* at 170 (Hecht, J., concurring).

[48] *Id.* at 170-171 (Hecht, J., concurring).

[49] *Id.* at 160 (Hecht, J., concurring).

[50] *Id.* at 172 (Hecht, J., concurring).

the Court was unanimous in allowing Baker to prosecute his legal malpractice claim.

This holding was despite the fact that a distortion of the parties' positions, a principal reason for *Zuniga*'s prohibiting assignments of legal malpractice claims, would still be front and center in the trial, with Baker asserting that he would have recovered if only Mallios had timely sued the right bar, and Mallios arguing that Baker really had no claim to start with, even though he had asserted the contrary in the suit he filed against the wrong bar. The Court did not discuss why the distortion of positions was not enough in and of itself to preclude prosecution of the malpractice claim or how the parties' change in positions should be handled at trial before the jury.

A similar distortion of positions occurs with Mary Carter agreements in which the plaintiff settles with one defendant who remains a party but joins forces with the plaintiff against the non-settling defendants so that one party seemingly in the defendants' camp sides with the plaintiff.[51] Before we prohibited such agreements, courts had taken prophylactic measures "to mitigate the agreements' harmful skewing of the trial process" generally by requiring full disclosure of the agreements to all parties and at trial so that the motives for the parties' alignment could be seen.[52] We concluded that remedial measures could "only mitigate and not eliminate the unjust

---

[51] *See Elbaor v. Smith*, 845 S.W.2d 240, 247 (Tex. 1992).

[52] *Id.* at 248-249; *see also Gandy*, 925 S.W.2d at 709-710.

19

influences exerted on a trial".[53] "[T]horoughly disclosing the true alignment of the parties[] and revealing the agreement's substance cannot overcome collusion between the plaintiff and settling defendants who retain a financial interest in the plaintiff's success."[54]

The conclusion to be drawn from the Court's unanimous judgment in *Mallios* is that while a pernicious distortion of positions in a legal malpractice case may be enough to prohibit the client's outright assignment of ownership of the claim, it is not enough to prohibit prosecution of the claim by the client in his own name, even if the client cedes to the other a significant right of control over prosecution of the claim as long as the client retains substantial control, and even though the distortion cannot be completely cured by disclosure or other procedures. Full disclosure of the parties' positions and interests in a legal malpractice case, inadequate to support the client's assignment of the claim, is the trial court's remaining tool to remedy that harm when the plaintiff sues on his own claim in his own name.

## B

Terry argues that the arrangements between HSM and Nussbaum are an assignment of HSM's legal malpractice claim barring prosecution as in *Zuniga*. But unlike the Zunigas, and like Baker in *Mallios*, HSM is pursuing in its own name its own claim as Terry's former client. Nussbaum's interests in the claim, and partial control over it, do not bar its prosecution.

---

[53] *Elbaor*, 845 S.W.2d at 249-250; *see also Gandy*, 925 S.W.2d at 709-710.

[54] *Elbaor*, 845 S.W.2d at 250; *see also Gandy*, 925 S.W.2d at 709-710.

20

HSM's plan of reorganization in the bankruptcy court authorized HSM to prosecute its legal malpractice claim "in its sole discretion", protected it from enforcement of Nussbaum's fraud judgment as long as it prosecuted its malpractice claim using its "best efforts and all reasonable means", and made "all proceeds therefrom" its property. The plan required Nussbaum to support HSM, but only for the obvious reason that recovery would benefit both (and other HSM creditors). Nussbaum's control over HSM's claim was much less than Herron's control over Baker's claim in *Mallios* because HSM chose and paid its own lawyer.

Baker and Herron's agreement in *Mallios* required both to consent to settlement. HSM's reorganization plan required Nussbaum's consent only for a settlement under $5 million. But HSM's settlement with its insurer as part of the same case was for more than that, so the consent provision has not been and cannot be triggered. The plan gave HSM "sole discretion to settle" for an amount over $5 million, with Nussbaum and Stanley to receive 70% of up to $13 million and 30% above that.

HSM and Nussbaum reiterated the reorganization plan's provisions in a separate litigation agreement, but it does not alter their relationship. The plan itself does little more than provide the bankruptcy court's imprimatur to the agreed arrangement, and perhaps a mechanism for enforcing it. Even without the arrangement, plan and all, Nussbaum would be entitled to enforce its fraud judgment against HSM at any time, and HSM would have every interest in avoiding that burden, including pursuing its malpractice claim to recover against

21

Terry, alleviating its obligation to Nussbaum. Terry insists that this shows why the malpractice claim should be disallowed. The possibility of such a claim interjects conflict between lawyer and client from the get-go and discourages lawyers from representing judgment-proof clients, to the detriment of the legal profession and the justice system. The alternative is that a solvent client can prosecute a legal malpractice claim while a distressed client cannot. Terry does not argue how this is a good public policy limitation of legal malpractice claims. Nothing about the plan, the agreement, or the arrangement requires that HSM be prohibited from enforcing its own legal malpractice claim in its own name, just as Baker was permitted to do in *Mallios*.

We add two caveats. Not at issue here is whether HSM and Nussbaum's arrangement is enforceable as between the two of them. The *Mallios* concurring opinion would have held that it is not. If not, a judgment debtor and creditor may be less likely to agree to cooperate in prosecuting the debtor/client's legal malpractice claim. The creditor may instead choose to rely on its enforcement rights.

The second caveat is whether the distortion of positions, which must be thoroughly explained to the jury, can be better remediated by raising the standard of proof of malpractice in such cases from a preponderance of the evidence to clear and convincing evidence. As we explain below, the lower standard of proof allows parties and lawyers to adduce summary opinion evidence from distorted positions to predict what a jury would have decided had a case been tried differently. We conclude that the opinion evidence here that Terry's negligence was the sole cause of the fraud judgment is conclusory and therefore cannot

support the verdict, but the question remains whether the standard should be higher. The parties have not argued this very significant issue, and we decline to address it.

We hold that HSM is not precluded from prosecuting its legal malpractice claim against Terry.

## III

We turn now to whether there is evidence to support the full amount of damages found by the jury—that is, the entire fraud judgment—or evidence that Terry was grossly negligent.

## A

The evidence supports the jury's finding that Terry was negligent in not designating Flaven as a responsible third party so that the jury in the fraud case could consider apportioning some of the fault resulting in Nussbaum's damages to him instead of all to HSM. Nussbaum's counsel, Marc Stanley, testified to that effect. His testimony must be viewed with considerable skepticism, given his insistent assertions in the fraud trial that his client was harmed exclusively by HSM's fraud, and his blatant flip in positions in the malpractice case for transparently financial reasons. But Terry also shifted positions between the two cases, arguing in the fraud trial that Flaven alone was responsible for Nussbaum's damages, then testifying in the malpractice trial that part of his hesitation in designating Flaven as a responsible third party was that the jury would have found HSM and Flaven both responsible. Lewis Sifford, an experienced trial lawyer, supported Stanley's opinion. Their opinions were some evidence that Terry was negligent with respect to the designation, and thus that HSM is entitled to recover some

23

damages..[55]

But the only evidence that HSM is entitled to recover the full amount of the fraud judgment as found by the jury—that is, that the fraud judgment against HSM was entirely Terry's fault—was conclusory. Stanley opined that had Flaven's fault been submitted to the jury, they would likely have apportioned 85-100% of the responsibility for Nussbaum's damages to him. Asked for the basis of his opinion, he testified only: "It's based on two things. One, it's what I told my client could be a very likely outcome. And, number two, based on my experience . . . ." Asked if he really "had no way to tell what [the jury in the fraud trial] would have done", Stanley answered, "[t]hat's absolutely correct." Sifford also opined that the jury would have apportioned fault to Flaven by exactly the same percentages as Stanley. Sifford testified that he had reviewed the record of the fraud trial. Although "you never know exactly what a jury's going to do," Sifford testified, he believed it was "reasonable the jury would have placed 85 to 100 percent responsibility on Mr. Flaven", based on "my experience, my training, my review of this file".

Stanley's and Sifford's opinions were evidence that Terry's negligence was *a cause* of the fraud judgment against HSM. The

---

[55] Stanley and Sifford also testified that Terry was negligent in stipulating that HSM was responsible for Defterios' actions. The testimony of HSM's president that he was "proud" of Defterios' actions would indicate that HSM authorized them even after the fact and undercuts the significance of the stipulation. But the president appeared to equivocate when he heard Defterios admit on the stand that he lied about Flaven's qualifications. Having concluded that there is evidence that Terry was negligent with respect to the designation, we need not, and therefore do not, consider whether he was also negligent in agreeing to the stipulation.

overwhelming evidence of Flaven's clear misconduct throughout the entire transaction made it almost inescapable that the jury would apportion some responsibility to him if asked. But it is not at all clear that the jury would have assigned fault to him entirely and not partly to HSM, given Defterios' admission to misconduct and HSM's president's ratification of Defterios' authority. The only evidence that Terry's negligence was *the sole cause* of the fraud judgment against HSM was Stanley's and Sifford's conclusory opinions based on their asserted experience. "[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."[56] Even an experienced lawyer "cannot simply say, 'Take my word for it . . . .'"[57]

Because there is evidence that Terry's negligence resulted in the

---

[56] *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

[57] *Id.* at 236. The dissent would go further and hold that Stanley's and Sifford's opinions are not probative evidence that Terry's negligence caused HSM any damages at all. But even if their opinions standing alone would not furnish evidence of causation of some damages, they are supported by the extensive record of Flaven's personal fraud.

The dissent argues that because the jury was instructed in the underlying trial to find only the amount of damages resulting from HSM's fraud, that amount must now be taken as established, and Stanley's and Sifford's opinions that the amount would have been less had the jury allocated responsibility to Flaven are "irrefutably false". *Post* at 4-6 (Bland, J., dissenting). In the dissent's view, given the jury's verdict, we must now assume that had it found that Flaven had also committed fraud and allocated partial responsibility to him, it would have awarded only additional damages against him, not less against HSM. But the jury might have found that HSM and Flaven were part of the same fraud, that the amount of damages was the same, and that they should be shared rather than borne by HSM alone. This has been the parties' understanding throughout this litigation. In essence, the dissent argues that a failure to designate a responsible third party can never result in harm to a defendant. The dissent offers no authority for this view, and we are aware of none.

25

fraud judgment against HSM but no evidence that it was the sole cause of that judgment, HSM is entitled to recover damages but not the total amount of the judgment as found by the jury. When there is evidence of some fraud damages but no evidence to support the full amount of damages found by the jury, remand for a new trial is the appropriate remedy. We thus conclude, as the court of appeals did, though for different reasons, that the trial court's judgment must be reversed and the case remanded for yet a third trial.[58]

**B**

HSM argues that Terry was grossly negligent only in failing to designate Flaven as a responsible third party.

"Gross negligence" means an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds

---

[58] *See Guevara*, 247 S.W.3d at 669-670; *see also Fortune Prod.*, 52 S.W.3d at 682. The dissent acknowledges that this is the general rule but argues that the case should not be remanded for a new trial because "the expert testimony is devoid of evidence of segregable damage attributable to legal malpractice." *Post* at 8 (Bland, J., dissenting). The dissent points to cases in which there was evidence of some but not all damages and characterizes the difference in them as segregable. None of the cases draw that distinction, the dissent cites no authority that does, and we are aware of none. In any event, a jury in the third trial may certainly take into account the nature of the damages to Nussbaum and when and how they occurred in allocating responsibility between Terry and HSM.

26

with conscious indifference to the rights, safety, or welfare of others.[59]

"[A]n extreme risk is 'not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.'"[60] Conscious indifference means that the "defendant knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others."[61] Exemplary damages awarded for gross negligence must be proved by clear and convincing evidence.[62]

The evidence of extreme risk from Terry's failure to designate Flaven as a responsible third party is unclear because of the circumstances presented. The evidence is essentially uncontradicted that such a failure poses an extreme risk when a jury is denied the opportunity to apportion responsibility to someone besides the defendant, exposing the defendant to greater liability than it would otherwise bear. The complication in the fraud trial was the concern that designating Flaven as responsible for Nussbaum's injuries could suggest to the jury that some responsibility should be apportioned when HSM's position was that it had no responsibility at all. In Terry's judgment, designating and not designating each bore risks, so the former offset the latter to some extent. There is evidence that Terry's judgment was

---

[59] TEX. CIV. PRAC. & REM. CODE § 41.001(11).

[60] *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917. 921 (Tex. 1998)).

[61] *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012)

[62] *See* TEX. CIV. PRAC. & REM. CODE § 41.003.

flawed, but the potential of extreme risk must be judged objectively, apart from his subjective views. The existence of extreme risk from not designating Flaven must be viewed in the context of the effect of designation on the entire trial.

But assuming that the evidence of extreme risk was clear and convincing, there is no probative evidence that Terry was consciously indifferent to it. The evidence shows that he was aware of the issue early in the case and weighed the proper course. There is no evidence that he did not care about the consequences of his decision to HSM. The court of appeals concluded that Terry was consciously indifferent because his decision was conscious and objectively unreasonable.[63] Terry acknowledged—indeed, asserted himself—that his decision was conscious, but explained that it was a hard judgment call. Because the issue is subjective, his explanation is uncontradicted. Evidence that his decision was objectively unreasonable goes to show that he was negligent, but it says nothing about whether he simply "did not care". The trial court in the first malpractice trial correctly directed a verdict for Terry on HSM's gross negligence claim. The judgment awarding punitive damages in the second trial must be reversed and judgment rendered that HSM take nothing on its gross negligence claim.

*　　*　　*　　*　　*

Accordingly, the judgment of the court of appeals is affirmed only insofar as it remands HSM's negligence claim for retrial and is otherwise reversed.

---

[63] *HSM III*, 684 S.W.3d at 513-514.

 

                               _____

                               Nathan L. Hecht
                               Chief Justice

**OPINION DELIVERED:** December 31, 2024